689 A.2d 662

**SOCIETY OF AMERICAN FORESTERS**

v.

**RENEWABLE NATURAL RESOURCES FOUNDATION.**

No. 357, Sept. Term, 1996.

Court of Special Appeals of Maryland.

Feb. 26, 1997.

---

James D. Dalrymple (Paul T. Stein and Stein, Sperling, Bennett, De Jong, Driscoll, Greenfeig & Metro, P.A., on the brief) Rockville, for Appellant.

Robert C. Park, Jr. (Robert H. Metz, James E. Gilbert and Linowes and Blocher LLP, on the brief) Silver Spring, for Appellee.

Argued before CATHELL, SALMON and EYLER, JJ.

SALMON, Judge.

The Circuit Court for Montgomery County (Mason, J.) granted, without leave to amend, Renewable Natural Resource Foundation's motion to dismiss a Complaint for Declaratory Relief filed by the Society of American Foresters (SAF or appellant). SAF sought a declaration as to whether a special zoning exception obtained by Renewable Natural Resource Foundation (RNRF or appellee) had lapsed, in 1979, as a matter of law. The two bases for the dismissal were: 1) that SAF released its right to bring the complaint; and 2) that SAF was barred from bringing the complaint by the doctrine of laches. On appeal, SAF raises one issue:

Whether the lower court erred, as a matter of law, in dismissing SAF's complaint.

## BACKGROUND FACTS [1]

SAF is a non-profit corporation with its principal place of business at 5400 Grosvenor Lane in Bethesda, Maryland. It was organized for the purposes of advancing the science, technology, education, and practice of professional forestry in

---

[1]. The underlying facts of this case are undisputed. We assume the truth of the facts set forth below because they were taken from appellant's complaint. *See Lubore v. RPM Assocs., Inc.,* 109 Md.App. 312, 323, 674 A.2d 547 (1996).

the United States and using the knowledge and skills of the profession to benefit society in general.

RNRF is a non-profit corporation, originally created by SAF and other natural resource professional societies. RNRF also has its principal place of business at 5400 Grosvenor Lane, which is a 35.4 acre parcel of land known as Wild Acres. RNRF was established to, *inter alia*, develop the Wild Acres property into a Renewable Natural Resources Center (the Center).

Before RNRF could develop the Center, a special exception to construct office buildings on the Wild Acres site, which was zoned for residential use, had to be obtained. The Montgomery County Board of Zoning Appeals (the Board) approved the special exception (the Special Exception) on November 21, 1973. The project, as originally approved, consisted of a total of 300,000 square feet of office space in a series of buildings to be constructed in three phases.[2] Because of a sewer moratorium in effect in Montgomery County at the time of the Special Exception's approval, the Board permitted RNRF to defer construction for three years, i.e., until November 21, 1976. The sewer moratorium, however, remained in effect as the expiration deadline for the Special Exception approached. The Board, on November 17, 1976, approved RNRF's request for a three-year extension of the Special Exception (hereinafter the Extension). Subsequently, on August 16, 1978, the Board approved RNRF's request that the Special Exception's use classification be amended from the category of "scientific society headquarters" to "eleemosynary and philanthropic institution," to reflect a revision in the Montgomery County zoning ordinance.

---

2. Phase I was anticipated to be 102,000 gross square feet, constructed over a five-year period (i.e., by 1978). Phase II was anticipated to be 181,000 square feet, constructed over the next five years (i.e., by 1983). Phase III, which was subject to the issuance of a new special exception, was anticipated to be constructed within 10 years after Phase II (i.e., by 1993).

A Montgomery County resolution lifted the sewer moratorium, effective November 13, 1979. In July 1980, RNRF submitted the site plan for Phases I and II of the Center's development to the Board. On October 1, 1980, the Board approved, with conditions, RNRF's site plan (the Site Plan Approval). Subsequently, the Montgomery County Department of Environmental Protection (DEP) issued a building permit to RNRF, and by June 1981, RNRF had constructed and occupied Building 1 of Phase I.

In summary, Montgomery County zoning authorities took at least five separate actions between 1973 and 1980, in granting the Special Exception, extending and renewing it, and permitting construction of office buildings at the Center site:

1) *November 21, 1973:* The Board granted the Special Exception.

2) *November 17, 1976:* The Board granted the Extension for the Special Exception.

3) *August 16, 1978:* The Board granted the amendment to the Special Exception's use classification to reflect revisions in Montgomery County's zoning ordinance.

4) *October 1, 1980:* The Board granted the Site Plan Approval for RNRF's site plan of Phases I and II of the Center's development.

5) *Late 1980:* DEP issued a building permit to RNRF.

Disagreements arose between the parties that led to litigation in the Circuit Court for Montgomery County in 1982. With the assistance of a mediation team the parties reached an accommodation of their respective positions. That accommodation was formalized in a settlement agreement (the Settlement Agreement), dated December 30, 1983.

Paragraph 1 of the Settlement Agreement provides:

The goals of each party relative to the other are hereby affirmed. Each party wants the other to succeed in its goals and prosper to a mutually beneficial coexistence. RNRF is interested in developing the Renewable Natural Resources Center.... SAF is interested ... in the con-

cept and success of the Renewable Natural Resources Center. SAF, therefore, intends to assist in the development of the Center....

The Settlement Agreement is premised on the validity of the Special Exception granted to RNRF. Paragraph 11 provides:

[A]ll property, land, and improvements referred to in this Agreement shall be used and maintained in accordance with the current special exception granted by the Montgomery County Board of Appeals, as may be amended from time to time by the Board of Appeals.

When the parties signed the Settlement Agreement, they also concurrently executed, under seal, a Mutual General Release (the Release). In the Release, SAF "forever discharged" RNRF

of and from all manner of actions, causes of actions, suits ... controversies, agreements, promises, variances, trespasses, damages, judgments, ... claims, obligations ... and demands whatsoever, in law, admiralty, in equity or otherwise, whether known or unknown, vested or contingent, which against RNRF and its Affiliates, or any of them, SAF ever had, now has, or which shall or may have for, upon or by reason of any manner, cause, thing, act or omission whatsoever, from the beginning of the world to the date of these presents....

Pursuant to the Settlement Agreement, SAF possesses development rights for 179,500 square feet of Phases I and II of the Center. RNRF possessed the development rights for Buildings 1 and 2, Phase I, which are the only buildings that RNRF constructed. With the exception of an additional 42,000 square feet of building rights that RNRF possesses for Building 3, RNRF is required to compensate SAF for any of SAF's building rights that RNRF uses to further construct the Center.

Under the Settlement Agreement, SAF is precluded from selling its development rights to anyone other than RNRF or from using its development rights in competition with RNRF

until after RNRF has completed Phase II of the Center. SAF also received fee title to 26.4 acres (subject to certain covenants) of the 35.4 acre parcel; SAF is, however, precluded from developing or selling any part of the 26.4 acres unless and until it is determined that RNRF failed to exercise due diligence and/or that the Center is no longer a viable project.

In order to insure that these restrictions would not be eternal, the parties agreed to conduct a joint review on January 1, 1994, and at ten-year intervals thereafter. Paragraph 16 of the Settlement Agreement provides that the ten-year review be conducted in order to re-evaluate the dual issues of whether RNRF has exercised due diligence in developing the Center and whether further physical development of the Center remains viable. If a three-member panel ultimately concludes that RNRF has failed to pass either the due diligence or viability tests, then SAF is free to develop and/or sell up to 8 acres of the subject property. Paragraph 16 states:

(a) On January 1, 1994, and at ten (10)–year intervals thereafter, the parties agree to a joint review to ascertain whether RNRF has exercised due diligence in developing the Renewable Natural Resources Center. *If the parties do not agree that RNRF has exercised due diligence, such disagreement will be settled by a panel of three (3) persons.* SAF and RNRF will each appoint one (1) member to the panel and those two (2) members will select the third member. If the panel finds that RNRF has not exercised due diligence, RNRF shall be deemed to have waived its rights under Paragraph 5 hereof relating to non-competition by SAF.

(b) The parties further agree that, on January 1, 1994, and at ten (10)–year intervals thereafter, they will jointly review whether further physical development of the Renewable Natural Resources Center is viable. *If the parties do not agree, such disagreement will be settled by a panel of three (3) persons.* SAF and RNRF will each appoint one (1) member, and those two (2) members will select the third member. If the panel finds that further physical develop-

ment of the Center is not viable, SAF will have the right to sell or develop up to (3) three acres of its land along Fleming Avenue and up to five (5) acres of its land along Interstate 495 which is developable ... free and clear of covenants and restrictions established in this Agreement or in any document executed contemporaneously herewith....

(Emphasis added.)

In early 1994, the parties commenced the process of "joint review" called for in paragraph 16. SAF and RNRF each selected a panel member of their choosing, but initially the parties' designated panel members could not agree as to the third member. While this case was pending, a third member was selected.

In preparing for the ten-year review process, SAF claims it first discovered that the site plan for Phase I and II was approved by the Board on October 1, 1980, almost one year after the Special Exception lapsed by its own terms. SAF's complaint sought a declaration as to whether the lapsing of the Special Exception in 1979 terminated its validity. SAF maintains that:

If the special exception terminated in 1979, then it does not exist today. If it does not exist today, RNRF's continued development of the Center can no longer legally be pursued because it has no special exception rights. This obviously has a direct impact on the future viability of the Center which is one of the issues which must be resolved through the joint review and three (3) member panel process.

## STANDARD OF REVIEW

■ Upon review of the grant of a motion to dismiss pursuant to Maryland Rule 2–322, "we assume the truth of all relevant and material facts well pleaded and all inferences which can be reasonably drawn from those facts." *Stone v. Chicago Title Ins. Co.*, 330 Md. 329, 333, 624 A.2d 496 (1993). To determine whether a motion to dismiss is proper, we, like the circuit court, "examine only the sufficiency of the pleading." *See Lubore v. RPM Assocs., Inc.*, 109 Md.App. 312, 326,

674 A.2d 547 (1996). If, the complaint does "not disclose, on its face, a legally sufficient cause of action," the grant of a motion to dismiss is proper. *Hrehorovich v. Harbor Hosp. Ctr.*, 93 Md.App. 772, 785, 614 A.2d 1021 (1992), *cert. denied*, 330 Md. 319, 624 A.2d 490 (1993).

## DISCUSSION

As explained below, we hold that, because the parties have agreed to arbitrate the issue that SAF"s complaint asks the court to resolve, the complaint alleges no cause of action for which relief can be granted. Thus, the trial judge properly granted RNRF"s Motion to Dismiss.[3]

The Maryland Uniform Arbitration Act, codified at Maryland Code Annotated, Courts and Judicial Proceedings sections 3–201 to 3–234 (1995 Repl.Vol.) (hereinafter the Arbitration Act), was enacted in 1965 as an alternative method of dispute resolution. *Marsh v. Loffler Hous. Corp.*, 102 Md. App. 116, 124, 648 A.2d 1081 (1994). It embodies a "legislative policy favoring enforcement of executory agreements to arbitrate." *Id.; Gold Coast Mall, Inc. v. Larmar Corp.*, 298 Md. 96, 103, 468 A.2d 91 (1983). By establishing a policy of settlement of disputes through arbitration, the General Assembly has "severely limited the role of the courts in this process." *Marsh, supra*, 102 Md.App. at 124, 648 A.2d 1081.

Recently, in *Birkey Design Group v. Egle Nursing Home*, 113 Md.App. 261, 265, 687 A.2d 256, 258 (1997), we stated:

Arbitration is an informal, expeditious, and inexpensive alternative to conventional litigation. *Marsh v. Loffler*

---

**3.** Although the trial court's basis for granting the motion to dismiss differs from ours, and the parties did not raise this argument before this Court or the trial court, an appellate court will affirm "where the record in a case adequately demonstrates that the decision of the trial court was correct, although on a reason not relied upon by the trial court and perhaps not even raised by the parties...." *Robeson v. State*, 285 Md. 498, 502, 403 A.2d 1221 (1979), *cert. denied*, 444 U.S. 1021, 100 S.Ct. 680, 62 L.Ed.2d 654 (1980). "[A] trial court may be right for the wrong reasons." *Berman v. Karvounis*, 308 Md. 259, 263, 518 A.2d 726 (1987).

*Hous. Corp.,* 102 Md.App. 116, 124, 648 A.2d 1081 (1994). Arbitration eases the burden on clogged court dockets; it offers parties an opportunity to submit disputes to one experienced in that field of business. *Snyder v. Berliner Constr.,* 79 Md.App. 29, 34, 555 A.2d 523 *cert. denied,* 316 Md. 550, 560 A.2d 1118 (1989).

■ Arbitration "originates from an agreement between the parties as to how and in what forum the parties will settle their disputes." *Id.* The existence of such an agreement between the parties providing for arbitration confers jurisdiction on a court to enforce the agreement. Md.Code Ann., Cts. & Jud.Proc. § 3–202. A party cannot, however, "be compelled to arbitrate that which it never agreed to arbitrate." *Stephen L. Messersmith, Inc. v. Barclay Townhouse Assocs.,* 313 Md. 652, 658, 547 A.2d 1048 (1988). Thus, we must first determine whether an agreement to arbitrate exists between the parties. If such an agreement exists, we must then determine whether the subject matter of this dispute is within the ambit of the arbitration clause. *See Joseph F. Trionfo & Sons, Inc. v. Larosa B. Ernest & Sons, Inc.,* 38 Md.App. 598, 604–607, 381 A.2d 727 (1978) [hereinafter *Trionfo & Sons*].

"A fundamental principal of contract interpretation is to ascertain and effectuate the intention of the parties." *Hartford Accident & Indem. Co. v. Scarlett Harbor Assocs. Ltd. Partnership,* 109 Md.App. 217, 290, 674 A.2d 106, *cert. granted,* 343 Md. 334, 681 A.2d 70 (1996) (hereinafter *Scarlett Harbor* ). The language of the contract itself is the primary source for determining the parties' intentions. *Shillman v. Hobstetter,* 249 Md. 678, 688–89, 241 A.2d 570 (1968); *Scarlett Harbor, supra,* 109 Md.App. at 291, 674 A.2d 106. If the language of a contract is clear, "it must be presumed that the parties meant what they expressed." *Board of Trustees of State Colleges v. Sherman,* 280 Md. 373, 380, 373 A.2d 626 (1977). The "clear and unambiguous language of an agreement will not give way to what the parties thought the agreement meant or intended it to mean." *Id.* Rather, "the true test of what is meant is . . . what a reasonable person in the position of the parties would have thought" the contract

meant. *General Motors Acceptance Corp. v. Daniels,* 303 Md. 254, 261, 492 A.2d 1306 (1985).

At the hearing on appellee's motion to dismiss, the court asked counsel for appellant "[H]aven't you in effect, by virtue of the agreement . . . agreed to arbitrate that issue between the two of you?" Appellant's counsel responded:

> I don't see that this is an arbitration provision. It doesn't say that it is binding arbitration. . . . And if it is not a binding arbitration then the legal issue of whether the special exception is alive needs to be decided by the Court, and that piece of the puzzle, when due diligence and viability is then given to the three [panel members], and when they consider all of the other issues on viability and due diligence they would then plug that decision in, the decision of the declaratory judgment . . . and then they can then go on from there because that is a *legal determination, not a factual* [determination].
>
> Perhaps if this had been under the Arbitration Act for the State of Maryland and it was called a binding arbitration, the answer to your question would be, yes, the three arbitrators would have to make that decision, but it doesn't say that.

(Emphasis added.)

■ We note at the outset that, under Maryland law, arbitration is not restricted to issues of fact. *Contract Constr., Inc. v. Power Technology Ctr. Ltd. Partnership,* 100 Md.App. 173, 185, 640 A.2d 251 (1994); *see also* 16 Samuel Williston & Walter H.E. Jaeger, *A Treatise on the Law of Contracts* § 1918, at 21 (3d ed. 1976) ("Questions of law as well as questions of fact may be submitted to arbitration."). Unless the parties indicate otherwise, issues of law and fact are submitted to the arbitrator for judgment. Williston, *supra,* § 1918, at 22 ("At common law and generally under the statutes, if parties submit an entire dispute to arbitration, they submit the law as well as the facts to the judgment of the arbitrators."); 6 C.J.S. *Arbitration* § 69, at 283–84 (1975) ("In the absence of any reservation, the parties are presumed to

agree that everything, both as to law and fact, which is necessary to the ultimate decision, is included in the authority of the arbitrators.").

The Maryland Uniform Arbitration Act "does not address the substantive requirements for an agreement to arbitrate the subject matter of a dispute." *Trionfo & Sons, supra,* 38 Md.App. at 605, 381 A.2d 727. To constitute an agreement to arbitrate under the Maryland Uniform Arbitration Act

> no particular form of words is indispensable to the making of a valid agreement to adjust and mediate a dispute between contracting parties without resort to litigation. Indeed, the language need not include the word "arbitrate" nor "arbitration." ... There must, however, be some reliable evidence from the language actually employed in the contract that the parties intended the disputed issue to be the subject of arbitration, the intent of the parties being the controlling factor.

*Id.*

██ We disagree with appellant's claim that paragraph 16 is not an arbitration clause under the Arbitration Act. Although the "panel" members are not referred to as arbitrators, the agreement states that "disagreement" on the issues of due diligence and viability "will be settled by" the three-person panel. "'Arbitration' is defined as 'the voluntary submission of a dispute to a disinterested person or persons for final determination.'" *Marsh, supra,* 102 Md.App. at 131, 648 A.2d 1081. Similarly, Black's Law Dictionary 135 (4th ed. 1968) defines an arbitrator as a "private, disinterested person, chosen by the parties to a disputed question, for the purpose of hearing their contention, and giving judgment between them." Clearly, the agreement calls for disinterested third parties to "settle" the disagreements between SAF and RNRF. Moreover, despite appellant's contentions to the contrary, the language of the agreement plainly provides that the findings of the panel are binding: Paragraph 16(b) states that, "if the panel finds that further physical development of the Center is not viable," SAF *will have the right* to sell or

develop certain property, while paragraph 16(a) states that, if the "panel finds that RNRF has not exercised due diligence," RNRF shall be *deemed to have waived* certain rights relating to non-competition.

Statements made by appellant in its complaint are also telling:

9. In early 1994, the parties commenced the process called for in paragraph 16(a) and 16(b). Both SAF and RNRF *have selected arbitrators* of their choosing. Unfortunately, the parties' *designated arbitrators* have reached different conclusions regarding the due diligence and viability issues *which are the subject of the ten (10) year review.* The parties are in the process of having a *third arbitrator* appointed in order to complete the review process.

10. Based upon the contrasting opinions and conclusions reached by *each party's designated arbitrator,* there have arisen several actual and justiciable legal controversies which must be adjudicated by this Court.... An adjudication by this Court regarding the issues posed herein will serve to both terminate the uncertainty and controversy which currently exists between the parties, as well as to facilitate the *arbitration process outlined above.*

(Emphasis added.) We consider SAF"s reference, in its complaint, to the members of the panel as "arbitrators" and to the paragraph 16 process as "the arbitration process," as a judicial admission. *See Beck v. Beck,* 112 Md.App. 197, 205, 684 A.2d 878 (1996) (facts and averments made in statements required to be filed under Maryland Rules constitute judicial admissions); *MCIC, Inc. v. Zenobia,* 86 Md.App. 456, 487, 587 A.2d 531 (1991), *rev'd in part on other grounds sub nom. Owens–Illinois, Inc. v. Zenobia,* 325 Md. 420, 601 A.2d 633 (1992) (holding that "under Maryland law, party admissions in pleadings are considered to be substantive evidence of the facts admitted").

We hold that paragraph 16 is a valid arbitration clause and that the issue of whether the special zoning exception lapsed is arbitrable under the agreement. We must next determine

whether SAF can seek declaratory judgment as to legal issues that have arisen in the pending arbitration.

■ The Maryland Uniform Declaratory Judgments Act, codified at Maryland Code Annotated, Courts and Judicial Proceedings sections 3–401 to 3–415 (1995 Repl.Vol.) (hereinafter the Declaratory Judgments Act), grants the court jurisdiction to construe a written contract and declare the rights of parties under the contract. *Harpy v. Nationwide Mut. Fire Ins. Co.,* 76 Md.App. 474, 477, 545 A.2d 718 (1987). With an exception not relevant, section 3–409(a) authorizes a circuit court to grant a declaratory judgment in a civil case "if it will serve to terminate the uncertainty or controversy giving rise to the proceeding" and if (1) an actual controversy exists between the parties; or (2) antagonistic claims are present that indicate "imminent and inevitable litigation"; or (3) a party asserts a legal status, right, or privilege "that is challenged or denied by an adversary party." Md.Code Ann., Cts. & Jud.Proc. § 3–409.

■ Section 3–409 casts the Declaratory Judgments Act as "an authorization, not a mandate. Section (a) states that a court 'may' grant a declaratory judgment under the circumstances noted, not that it must." *Loveman v. Catonsville Nursing Home,* 114 Md.App. 603, 611, 691 A.2d 693, 697 (1996). Thus, a court has discretion "to refuse a declaratory judgment when it does not serve a useful purpose or terminate a controversy." *Staley v. Safe Deposit & Trust Co.,* 189 Md. 447, 456–57, 56 A.2d 144 (1947). Moreover, " '[w]here an action or proceeding is already pending in another forum involving the same issues, [absent very unusual and compelling circumstances], it is manifestly unwise and unnecessary to permit a new petition for a declaration to be initiated.' " *A.S. Abell Co. v. Sweeney,* 274 Md. 715, 721, 337 A.2d 77 (1975) (quoting with approval Borchard, *Declaratory Judgments* (2d ed. 1941)); *Brohawn v. Transamerica Ins. Co.,* 276 Md. 396, 405, 347 A.2d 842 (1975) (a court will refuse to grant a

declaration, where " 'a proceeding involving identical issues is already pending in another tribunal' ").

■ Section 3–409(b) provides that declaratory relief is inappropriate where "a statute provides a special form of remedy" for a particular kind of case. Thus, where the remedy provided by a statute is exclusive, i.e., "where the Legislature intended to prohibit the exercise of concurrent jurisdiction by the courts," section 3–409(b) will "deprive a trial court of the power to render a declaratory decree." *Maryland–Nat'l Capital Park & Planning Comm'n v. Wash. Nat'l Arena*, 282 Md. 588, 596, 386 A.2d 1216 (1978). The Arbitration Act is an exclusive statutory remedy of dispute resolution when an arbitration agreement exists between the parties. *See* Md.Code Ann., Cts. & Jud.Proc. § 3–207(c); *Stauffer Constr. Co. v. Board of Educ.*, 54 Md.App. 658, 664, 460 A.2d 609 ("When such an [arbitration] agreement exists, or is alleged to exist, the courts are generally enjoined by the statute from interfering with the arbitration process. Indeed, the court's jurisdiction may properly be invoked in but two limited contexts—to compel arbitration or to stay it."), *cert. denied*, 297 Md. 108 (1983).

■ The trial court properly dismissed SAF"s Complaint for Declaratory Relief. First, it would thwart the legislative purpose of arbitration as an informal, expeditious, and final resolution of disputes to allow parties to seek declaratory judgments from the courts on legal issues that are delegated to arbitration. *See* Williston, *supra*, § 1919A, at 156 ("[A] party to a contract which provides for arbitration of disputes thereunder, may not seek a declaratory judgment as to his rights before requesting arbitration."). Second, any declaration issued by the lower court would be an advisory opinion on issues of law that, by agreement, the arbitrators are to decide. *See id.* ("[A]n action for declaratory judgment seeking an advisory opinion for arbitrators, which would not be binding upon them, is unwarranted."). Third, because the parties have bargained for arbitration as their method of dispute resolution, allowing SAF to seek a declaratory judgment

would permit SAF to circumvent its contractual agreement to arbitrate. *See Hartford Ins. Group v. Kassler,* 227 Pa.Super. 47, 324 A.2d 521, 522 (1974) stating:

> The inclusion of an arbitration agreement in a contract for the resolution of disputes thereunder "indicates that the parties contemplated one method, and one method only, for the resolution of disputes under this [contract]. That method was arbitration and all such disputes should be so decided." *Preferred Risk Mutual Ins. Co. v. Martin,* 436 Pa. 374, 376, 260 A.2d 804 (1970) (emphasis added).... [This case, and others cited, rests] upon the exclusion, by agreement, of court proceedings as a vehicle for the resolution of disputes. To permit a declaratory judgment proceeding would render the parties' agreement to arbitrate disputes nugatory.

*See also Nationwide Mut. Ins. Co. v. Megill,* 449 F.Supp. 1200, 1203 (1978) (citing *Kassler, supra,* with approval); *Oakdale Park, Ltd. v. Byrd,* 346 So.2d 648, 650 (Fla.Dist.Ct.App. 1977) ("A party, who has entered into a contract requiring arbitration, may not flagrantly disregard this contractual prerequisite, march down to the courthouse, file a complaint" and ignore its "contractual duty to arbitrate."). Finally, declaratory judgment is inappropriate in the instant case because the parties have agreed to arbitrate and the Maryland Uniform Arbitration Act is an exclusive statutory remedy. *See Metropolitan Property & Casualty Ins. Co. v. Brennen,* No. 90–6983, 1991 WL 61125, 1991 U.S.Dist. Lexis 5156, at *9 (E.D.Pa. April 4, 1991) (finding that, because the dispute at issue fell within scope of an arbitration agreement, under the Pennsylvania Uniform Arbitration Act, the court "must enforce that agreement" and is "without jurisdiction to proceed on the declaratory judgment action").

As we recently stated in *Birkey Design, supra,* 113 Md.App. at 269, 687 A.2d at 259, "The goal in arbitration is to make an arbitration award the end, rather than the commencement, of litigation." By "focusing resolution at the lowest level," we believe that our holding furthers the legislative goal of "expe-

ditious and final resolution of disputes through arbitration." *Id.* at 270, 687 A.2d at 260.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**