819 A.2d 1149

David A. SUMRALL

v.

STATE OF MARYLAND CENTRAL COLLECTION UNIT.

No. 0071, Sept. Term, 2002.

Court of Special Appeals of Maryland.

March 28, 2003.

David A. Sumrall, Hagerstown, for appellant.

Beverly F. Hughes, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. on the brief), Baltimore, for appellee.

Argued before MURPHY, C.J., DAVIS and LAWRENCE F. RODOWSKY (Ret'd, specially assigned), JJ.

MURPHY, Chief Judge.

On August 21, 2001, in the Circuit Court for Somerset County, David A. Sumrall, appellant, filed a complaint for declaratory judgment in which he sought the following relief:

> It is prayed this Honorable Court *ORDER* the Central Collections Unit for the State of Maryland to *CEASE AND DESIST* any and all attempts to collect the Criminal Restitution in Criminal case Sumrall v[.] State of Maryland CT 2394 as being unconstitutional. To Restore petitioners tax returns, and to completely leave petitioner alone in this matter, in the future.

> And or any other relief this Honorable Court may deem appropriate.

On March 6, 2002, the Honorable Daniel M. Long filed an Order that stated:

> Upon consideration of Defendant's Answer to Complaint for Declaratory Judgment, any response thereto, and upon finding that plaintiff is not entitled to the relief requested in his Complaint for Declaratory Judgment, and that the referral of plaintiff's indebtedness under the December 7, 1981 order of the Circuit Court for Allegany County was proper, it is this *6th* day of *March,* 2002 by the Circuit Court for Somerset County, Declared, Determined, and ORDERED that the relief requested in plaintiff's Complaint for Declaratory Judgment is denied and this case is dismissed.

This appeal followed.

Appellant presented one question for our review,[1] which we have divided and rephrased as follows:

---

1. Appellant's original question was as follows:
 How can a Maryland State Agency Sue a person for there [sic] "Estate" if the Maryland State Constitution in *flat terms* says they can't?

I. DOES ARTICLE 27 OF MARYLAND'S DECLARA-
 TION OF RIGHTS PROHIBIT A COURT FROM
 ORDERING A DEFENDANT TO PAY RESTITU-
 TION AS PART OF HIS SENTENCE?

II. DID THE CIRCUIT COURT ERR WHEN IT DE-
 TERMINED APPELLANT'S RESTITUTION OBLI-
 GATIONS WERE PROPERLY REFERRED TO
 MARYLAND'S CENTRAL COLLECTION UNIT
 FOR COLLECTION, AFTER APPELLANT
 STOPPED MAKING PAYMENTS TO THE DIVI-
 SION OF PAROLE AND PROBATION?

For the reasons that follow, we shall answer "no" to each question above and affirm the judgment of the circuit court.

### Factual Background

On September 10, 1981, appellant entered pleas of guilty to two counts of assault with intent to murder. On December 7, 1981, he was sentenced to the custody of the Commissioner of Corrections.[2] As part of appellant's sentence, he was required to pay a total of $110,854.67 in restitution to his victims. The judgment provided that, upon his release from confinement, appellant was obligated to make the restitution through the Division of Parole and Probation ("Division"). When appellant was paroled, he began to make payments in conformity with the judgment of the sentencing court.

On July 15, 1997, however, appellant's parole was revoked. Shortly thereafter, appellant stopped making restitution payments to the Division. On July 23, 1998, the Division referred the balance of appellant's restitution obligation to the CCU. On August 29, 2000, the CCU sent a letter to appellant stating that his outstanding balance of restitution owed by him was $97,343.39, that a 17% collection fee (amounting to $16,548.37) was added to the original amount, and that the total amount of his restitution obligation was $113,891.76.

---

2. Appellant was sentenced to serve two consecutive thirty-year terms.

## Discussion

A declaratory judgment is one that declares the rights of the parties and does not necessarily involve executory process or coercive relief. *Davis v. State,* 183 Md. 385, 389, 37 A.2d 880 (1944). The declaration of judgment in such a manner is within the sound discretion of the court. *Brohawn v. Transamerica Ins. Co.,* 276 Md. 396, 406, 347 A.2d 842 (1975); *see also Chaghervand v. CareFirst,* 909 F.Supp. 304, 313 (D.Md.1995). The court is not required to enter a declaratory judgment in every case. *Society of Am. Foresters v. Renewable Natural Resources Found.,* 114 Md.App. 224, 238, 689 A.2d 662, (1997); *Marriott Corp. v. Village Realty & Inv. Corp.,* 58 Md.App. 145, 153, 472 A.2d 510, *cert. denied,* 300 Md. 316, 477 A.2d 1195 (1984).

Md. Const. art. 27 ("Article 27") provides "[t]hat no conviction shall work corruption of blood or forfeiture of estate." According to appellant, this provision prohibits the CCU from attempting to collect his remaining restitution obligations. Although neither the Court of Appeals nor this Court has interpreted this provision, we have the benefit of case law from other jurisdictions that have an identical or a very similar provision in their constitutions.

In *Wellner v. Eckstein,* 105 Minn. 444, 117 N.W. 830 (1908), the Supreme Court of Minnesota considered the question of whether the children of a man who was murdered by his wife could claim an interest in real property owned by their father at the time of his death and thereafter sold by the widow-murderess following probate of the deceased's estate. The Minnesota Constitution included a provision that "no conviction shall work corruption of blood or forfeiture of estate," and that provision was invoked in support of the proposition that the sale was valid. Without relying upon—or interpreting—that provision, a majority of the court held that the District Court for Nicollet County had ruled correctly in sustaining the purchaser's demurrer to the children's complaint. Justice Elliot, however, filed a dissenting opinion that included the following analysis:

The invocation on [the widow-murderess-seller's] behalf of the constitutional provision that no conviction shall work corruption of blood or forfeiture of estate rests upon a misapprehension of the scope and purpose of that provision. It found its way into the federal constitution in connection with the punishment for treason. It was adopted in the constitutional convention with little discussion as a precautionary measure suggested by the history of the English law of treason. An early act of congress (section 24, c. 9, Acts 1790, 1 St. 117) made the prohibition general by providing that "no conviction or judgment for any of the offenses aforesaid, shall work corruption of blood, or any forfeiture of estate." Similar provisions are found in the constitution of several states. Stimson, Federal & State Constitutions, p. 182, note 6. By the common law a person convicted of a felony was by operation of law placed in a state of attainder, which resulted in forfeiture of estate, corruption of blood, and civil death. This result followed, not from the commission of the crime, but as a result of the conviction thereof. The attainted person was not divested of his land until after [the person was convicted]. So, in the case of goods and chattels, forfeiture had relation only to the time of conviction, and after the commission of a felony and before conviction the guilty party could make a valid sale or assignment of his personal property. These provisions abolish the common-law rule by which corruption of blood and forfeiture of estate resulted from the conviction of a felony. Corruption of blood rendered the felon incapable of inheriting or of transmitting property by inheritance. Forfeiture of estate transferred his property to the state. The heirs were thus deprived of their inheritance and the treasury enriched, and it was to prevent the manifest wrong and injustice to innocent persons which resulted from this doctrine that these constitutional provisions were adopted.

117 N.W. at 840 (citations omitted).

Seventy two years later, the United States Court of Appeals for the Fourth Circuit stated:

Article III, § 3, c. 2 of the Constitution[ 3] was supplemented by the first congress, which enacted 1 Stat. 112, 117 (1790), presently codified as 18 U.S.C. § 3563. Currently, that sections reads: "No conviction or judgment shall work corruption of blood or any forfeiture of estate." . . . Under early English law, the complete forfeiture of all real and personal property followed as a consequence of conviction of a felony or treason. In fact, the term "felony" was defined under English law as "an offense which occasions a total forfeiture of either lands or goods or both." In addition, when convicted of treason or a felony, the defendant's "blood was corrupted" so that nothing could pass by inheritance through his line. This sweeping imposition of forfeiture, which disinherited men because they were kindred to felons, may not have been wholly irrational in a feudal society in which land and property were ultimately held through the crown, and the commission of a felony (particularly treason) constituted a serious breach of the original bond of allegiance to the king, the offender's feudal lord, and to society. As English society changed, however, the broad forfeitures imposed at common law were modified by statute. At the time of the adoption of the Constitution, it appears that forfeiture of estate and corruption of blood were still imposed in England for some of the more serious felonies and for treason. In 1814, the English Parliament abolished corruption of blood as a punishment for all felonies except murder (although forfeiture of estate for serious felonies seems to have survived for some time thereafter), and a statute limiting forfeiture for treason to the life of the offender was enacted in the early nineteenth century.

Forfeiture of estate found little favor in the American Colonies. Although forfeiture practices varied substantially from colony to colony, they were never as severe as those prevalent in England during the American colonial period.

---

3. U.S. Const. art. 3, § 3, cl. 2 provides, that "[t]he Congress shall have power to declare the punishment of treason, but no attainder of treason shall work corruption of blood, or forfeiture except during the life of the person attained."

In 1787, the imposition of forfeiture of estate and corruption of blood for treason was banned by the Constitution. Three years later, the first congress abolished that penalty for all convictions and judgments.

The legal significance of this historical background is that nothing contained therein suggests that either article III or the 1790 statute was intended to prohibit anything other than corruption of blood or forfeiture of estate as imposed at common law. To the contrary, it is clear that both article III and the subsequent statute contemplated broad forfeitures incident to attainder as a traitor or felon, i.e., total disinheritance of one's heirs or those who would be one's heirs and forfeiture or all of one's property and estate.

*United States v. Grande,* 620 F.2d 1026, 1037–39 (4th Cir. 1980). (citations omitted)(footnotes omitted).

In *State v. Young,* 63 Wash.App. 324, 818 P.2d 1375 (1991), the defendant was convicted of two counts of vehicular homicide. *Id.* at 325, 818 P.2d 1375. He was sentenced to serve twelve-months for each count in a work release program, and to pay restitution in the amount of $250 per month. *Id.* The defendant argued that this restitution obligation was unconstitutional under Article 1, section 15 of the Washington Constitution.[4] The Court of Appeals of Washington held that this argument had no merit, explaining:

When the United States Constitution was being drafted, its framers wanted to limit the perpetual aspect of forfeitures for treason.... The framers' intent was manifested in U.S. Const. art. 3, § 3, cl. 2. It provides:

The congress shall have power to declare the punishment of treason, but no attainder of treason shall work corruption of blood, or forfeiture except during the life of the person attained....

Article 1, section 15 of the Washington Constitution is related to U.S. Const. art. 3, § 3, in that both deal with

---

4. Article 1, § 15 of Washington's Constitution provides that "[n]o conviction shall work corruption of blood, nor forfeiture of estate."

forfeitures. Const. art. 1, § 15, however, prohibits more than just the perpetual aspect of forfeitures. It provides:

No conviction shall work corruption of blood, nor forfeiture of estate.

Still, when construed in light of its common law history, Const. art. 1, § 15 only prohibits forfeiture of a convict's estate on the ground that he or she is incapacitated from owning property due to conviction. It does not prohibit forfeiture for a variety of other rational and legitimate purposes, such as punishing the defendant to a degree commensurate with the crime (fines); rehabilitating the defendant by requiring restitution or other monetary payments, or depriving the defendant of the fruits or instrumentalities of the crime.

*Young,* 63 Wash.App. at 328–329, 818 P.2d 1375 (citations omitted).

▇▇▇ We agree with the above quoted analyses. We therefore hold that, while Article 27 of Maryland's Declaration of Rights prohibits forfeiture of a defendant's property on the ground that he or she is incapacitated from owning property due to his or her conviction, that provision does not mean that it is unconstitutional for a court to issue an order compelling a defendant to pay restitution to his or her victim(s).

▇▇▇ In the case at bar, the circuit court's order of restitution was not premised on the notion that appellant was prohibited from owning property due to his conviction, but instead worked to achieve the fundamental goal for ordering restitution which is, "rehabilitating the defendant and affording the aggrieved victim recompense for monetary loss." *Anne Arundel County v. Hartford Accident & Indem. Co.,* 329 Md. 677, 685, 621 A.2d 427 (1993)(quoting *Lee v. State,* 307 Md. 74, 78, 512 A.2d 372 (1986)).

▇▇▇ We must also determine whether the restitution order at issue was actually part of appellant's sentence or merely a condition of his probation. Appellant remains obli-

gated to pay the outstanding balance of restitution only if that obligation was part of his sentence.

It is now quite clear that a trial judge may order restitution either as a condition of probation, *see* Md.Code Ann. art. 27, §§ 640(c) and 641A(a); *Coles v. State,* 290 Md. 296, 305, 429 A.2d 1029 (1981), or as a part of a sentence. *See Smitley v. State,* 61 Md.App. 477, 482, 487 A.2d 315 (1985). It is also quite clear, as we painstakingly and clearly explained in *Smitley,* that there is "a significant distinction between the two methods." *Id.* at 483, 487 A.2d 315. One distinction relates to the method of enforcement:

> If the order is made "as a sentence," it may, if the State shows an ability on the part of the defendant to comply with the order, be enforced through contempt proceedings. If, on the other hand, the order is not stated "as a sentence" but rather as a condition of probation or parole, it may be enforced through the power to revoke the probation or parole. (footnote omitted)

*Id.* The more significant distinction, however, relates to "the inability of the court to increase or enhance a sentence that has once and validly been imposed." *Id.* We explained:

> When restitution is ordered "as a sentence," enforcement through contempt proceedings serves merely to implement the sentence, not to enhance it. It is an additional remedy to that provided in [art. 27,] section 637. Similarly, when restitution is attached as a condition to probation and, upon non-compliance, the court revokes the probation and directs execution of all or any part of the suspended sentence, the initial sentence has merely been implemented, not enhanced. It may even be possible, pursuant to section 642 of art. 27, for the court to direct execution of the suspended sentence, suspend anew part of that sentence, place the defendant on further probation, and continue an order of restitution as a condition of the new probation. What the court may *not do,* however, when the restitution is not "as a sentence" but only a condition of probation, is to direct execution of the *full*

*term* of the suspended sentence *and* continue the restitution order, either "as a sentence" or as a condition to some further probation. That is equivalent to *increasing,* not merely *implementing,* the suspended sentence. (emphasis in the original, footnote omitted).

61 Md.App. at 484, 487 A.2d 315.

It is, therefore, critically important that we resolve as a threshold matter whether ... the restitution was ordered only as a condition of probation, or, ... as a part of the sentence, or whether it was ordered both as a condition of probation and as a part of the sentence.

*Jackson v. State,* 68 Md.App. 679, 684–86, 515 A.2d 768 (1986).

In the case at bar, the judgment as reflected by the docket entries was as follows:

Upon being release [sic] defendant make restitution in the amount of 50% of his net earnings for a total of $110,854.67. Sentence accounting from February 22, 1981.

The relevant language persuades us that restitution was part of the original sentence and not merely a condition of parole or probation. We therefore hold that appellant's restitution obligation was not wiped out by his parole revocation.

## II.

■ Appellant argues that the circuit court erred when it found that the outstanding balance of his restitution obligation was properly transferred from the Department to the CCU for collection. There is no merit in that argument.

Maryland's mechanism for collecting criminal restitution is provided by Md.Code (2001), § 11–616 of the Criminal Procedure Article ("C.P."). This section, in pertinent part, provides:

(a) Referral of overdue accounts.—The Division or the Department of Juvenile Justice:

(1) in addition to other actions authorized under Part I of this subtitle, **may refer an overdue restitution ac-**

count for collection to the Central Collection Unit; and

(2) if probation or other supervision is terminated and restitution is still owed, shall refer the overdue restitution account for collection to the Central Collection Unit.

(b) Central Collection Unit.—Subject to subsection (c) of this section, the Central Collection Unit may:

(1) collect overdue restitution in accordance with Title 3, Subtitle 3 of the State Finance and Procurement Article;

(Emphasis added).

Appellant argues that his obligation to pay restitution falls within the exceptions outlined under section 3–302(b), of the State Finance and Procurement Article ("S.F."), which provides:

(a) General responsibility.—(1) **Except as otherwise provided in subsection (b) of this section or in other law, the Central Collection Unit is responsible for the collection of each delinquent account or other debt that is owed to the State or any of its officials or units.**

(2) An official or unit of the State government shall refer to the Central Collection Unit each debt for which the Central Collection Unit has collection responsibility under this subsection and may not settle the debt

. . . .

(b) Exceptions.—Unless, with the approval of the Secretary [of Budget and· Management], a unit of the State government assigns the claim to the Central Collection Unit, the Central Collection Unit is not responsible for and may not collect:

(1) any taxes;

(2) any child support payment that is owed under Article 88A, § 48 of the Code:

(3) any unemployment insurance contribution or overpayment;

(4) any fine;

(5) any court costs;

(6) any forfeiture on bond;

(7) any money that is owed as a result of a default on a loan that the Department of Business and Economic Development has made or insured; or

(8) any money that is owed under Title 9, Subtitles 2, 3, and 4 and Title 20 of the Insurance article.

(Emphasis added).

 "The cardinal rule of statutory interpretation is to ascertain and effectuate the intention of the legislature." *Oaks v. Connors*, 339 Md. 24, 35, 660 A.2d 423, 429 (1995). Legislative intent must be sought in the first instance in the actual language of the statute. *Marriott Employees Fed. Credit Union v. Motor Vehicle Admin.*, 346 Md. 437, 444–45, 697 A.2d 455, 458 (1997); *Stanford v. Maryland Police Training & Correctional Comm'n*, 346 Md. 374, 380, 697 A.2d 424, 427 (1997) (quoting *Tidewater v. Mayor of Havre de Grace*, 337 Md. 338, 344, 653 A.2d 468, 472 (1995)); *Coburn v. Coburn*, 342 Md. 244, 256, 674 A.2d 951, 957 (1996); *Romm v. Flax*, 340 Md. 690, 693, 668 A.2d 1, 2 (1995); *Oaks*, 339 Md. at 35, 660 A.2d at 429; *Mauzy v. Hornbeck*, 285 Md. 84, 92, 400 A.2d 1091, 1096 (1979); *Board of Supervisors v. Weiss*, 217 Md. 133, 136, 141 A.2d 734, 736 (1958). Moreover, if the statutory language is plain and free from ambiguity, and expresses a definite and simple meaning, courts do not normally look beyond the words of the statute itself to determine legislative intent. *Marriott Employees*, 346 Md. at 445, 697 A.2d at 458; *Kaczorowski v. Mayor of Baltimore*, 309 Md. 505, 515, 525 A.2d 628, 633 (1987); *Hunt v. Montgomery County*, 248 Md. 403, 414, 237 A.2d 35, 41 (1968).

The language of S.F. § 3–302 is plain and unambiguous. If the General Assembly intended to include restitution payments among the exceptions included in § 3–302(b), it would

have done so. We are persuaded that, as restitution payments are simply not the equivalent of any of the enumerated exceptions found in § 3–302(b),[5] the Department was authorized to refer appellant's outstanding balance of restitution to the CCU.[6]

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**

---

5. In *Tracey v. Tracey*, 328 Md. 380, 387, 614 A.2d 590, 594 (1992), while construing an alimony statute, the Court of Appeals stated:

 While the language of the statute is the primary source for determining legislative intention, the plain meaning rule of construction is not absolute; rather, the statute must be construed reasonably with reference to the purpose, aim, or policy of the enacting body. The Court will look at the larger context, including the legislative purpose, within which statutory language appears. Construction of a statute which is unreasonable, illogical, unjust, or inconsistent with common sense should be avoided. [Citations omitted.]

 A look at the larger context persuades us that our interpretation is correct. Assuming, arguendo, that appellant's restitution obligations fall within the enumerated exceptions under § 3–302(b), the Secretary of Budget and Management, in a letter dated November 15, 1999, approved the collection.

6. During the period of time that a defendant is being supervised by the Division, the Division is responsible for collecting any fines, court costs and restitution. If the defendant's probation expires, is revoked or is otherwise terminated, the CCU is responsible for collecting those funds. Our research has revealed that, under the current procedures authorized by the Secretary of Budget and Management, the CCU will also assume responsibility for collecting fines and court costs. We therefore recommend that the judge who terminates the defendant's probation (1) determine the amount of fines, costs, and restitution that have not been paid, (2) make sure that the defendant's restitution obligation has been referred to the CCU, and (3) unless the judge determines that any or all of the uncollected fines and court costs should be deemed uncollectible, make sure that the defendant's obligation to pay the unpaid fines and costs is also referred to the CCU.