13 A.3d 1

Nicholas SHARP

v.

Barry K. DOWNEY, et al.

No. 1642, Sept. Term, 2009.

Court of Special Appeals of Maryland.

Dec. 17, 2010.

Reconsideration Denied March 10, 2011.

124

126

128

Karen D. Amos, Ellicott City, MD, for appellant.

Jeffrey P. Reilly (Miles & Stockbridge, PC, on the brief) Towson, MD, for appellee.

Panel: HOLLANDER, MEREDITH, ZARNOCH, JJ.[1]

HOLLANDER, J.

Nicholas Sharp, appellant, and Barry and Rhonda Downey, appellees, own adjacent tracts of land in Howard County. For almost eight years, the parties, as well as their predecessors in title and some of their neighbors, have been engaged in litigation as to various matters regarding the adjoining parcels. In 2007 and 2008, the Circuit Court for Howard County ordered the parties to submit their disputes to binding arbitration. Of relevance here, in an Arbitration Award (the "Award") dated December 22, 2008 (issued January 6, 2009), the arbitrator rejected appellant's claim that he is entitled to an easement over a portion of appellees' land in order to reach a public road. That decision left appellant's parcel "landlocked."

Dissatisfied with the Award, appellant unsuccessfully asked the Circuit Court for Howard County to vacate it. This appeal followed, in which appellant presents one issue: "Whether the circuit court erred in refusing to vacate the

---

1. Judge Alexander Wright, Jr., did not participate in the Court's decision to report this opinion pursuant to Md. Rule 8–605.1.

arbitrator's decision and award[.]" For the reasons that follow, we shall reverse and remand.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

The properties at issue are two adjacent, irregularly shaped lots in Woodbine, along the South Branch of the Patapsco River at the northern border of Howard County. Appellant's property is located at 400 Morgan Station Road. We shall refer to it as "Lot 2" or the "Sharp Lot." Appellees' property is located at 410 Morgan Station Road. We shall refer to it as "Lot 1" or the "Downey Lot."

Originally, the two lots were a single tract of land owned by Jack Ryan, Inc., the corporate alter ego of John E. Ryan (collectively, "Ryan"). On February 20, 1996, Ryan divided the tract by deed, creating Lot 1 and Lot 2. By a separate deed of even date, Ryan conveyed Lot 1 (*i.e.*, the Downey Lot) to Pamela Jekel, Inc.,[3] and retained ownership of Lot 2 (*i.e.*, the Sharp Lot). Notably, the Downey Lot adjoins Morgan Station Road, while the Sharp Lot is (in the words of the arbitrator) "landlocked." [4]

---

**2.** The litigation has encompassed several disputes related to the two properties at issue here and other adjacent tracts. The arbitrator resolved three disputes between Sharp and the Downeys, only one of which is the subject of this appeal. We recite only the facts that are relevant to this appeal.

**3.** Pamela Jekel, Inc., is the corporate alter ego of Pamela Jekel Ryan. Unless otherwise noted, we shall refer collectively to the corporation and the individual as "Jekel." Ms. Jekel is married to John Ryan. However, the two apparently were not married when Ryan conveyed the Downey Lot to Jekel.

**4.** The record does not explicitly disclose whether Lot 2 has access to any public road other than Morgan Station Road, which is relevant to the issue of whether there is an implied easement by necessity. *See, e.g., Condry v. Laurie,* 184 Md. 317, 322, 41 A.2d 66 (1945) ("[T]he court will not recognize a way of necessity if another road to the public highway can be made without unreasonable expense, even though the other road may be much less convenient."). But, because "factual findings by an arbitrator are virtually immune from challenge," *Mandl v. Bailey,* 159 Md.App. 64, 92, 858 A.2d 508 (2004), we accept the

On the same date as the conveyance of Lot 1, Ryan and Jekel executed two instruments relating to two separate easements concerning Lot 1 and Lot 2. One instrument, entitled "Declaration for Ingress and Egress Easement (Driveway) and Maintenance Agreement," established an easement "over the existing jeep trail located on Lot 1" (*i.e.*, the Downey Lot). We shall refer to this agreement as the "Original Jeep Trail Agreement." The other easement instrument, entitled "Declaration for Easement and Maintenance Agreement," is referred to by the parties as the "Riverfront Easement." All four instruments were recorded in the land records of Howard County on February 27, 1996.

According to the Original Jeep Trail Agreement, "[t]he Easement shall be for the sole purpose of ingress and egress for foot and vehicular traffic and for no other purpose." It noted that the jeep trail "is not described in a metes and bounds description," but stated that the jeep trail was "shown on an unrecorded plat titled, 'Health Department Percolation Certification Plan, Project No. 423' " (the "Health Department Plan").[5] The Original Jeep Trail Agreement also provided: "The beginning of the Easement at Morgan Station Road is at the driveway which is used in common with 430 Morgan Station Road and [the easement] ends at the northeast boundary of Lot 2." Further, it stated that the easement was "perpetual" and "binding on the parties [and their] successors and assigns." It also provided that, "[i]n the event of disagreement between the owners of Lots 1 and 2 as to the use, repairs, maintenance of the Easement, or any other issue, the dispute shall be resolved in accordance with the American Arbitration Association rules and procedures. . . ."

---

arbitrator's finding that, in the absence of access to Morgan Station Road, Lot 2 is "landlocked."

5. The parties' submissions and the Award made clear that two versions of the Health Department Plan were offered into evidence at the arbitration. However, only a single version of the Health Department Plan has been reproduced in the record extract.

The Riverfront Easement granted to Jekel (and her successors in title) an easement over a narrow strip of riverfront property that was part of Lot 2, and which separated Lot 1 from the Patapsco River. In relevant part, it stated that "Ryan will not in anyway interfere with Jekel's use of the easement such as moving animals to the river or any other purpose." The primary significance of the Riverfront Easement to the issues on appeal is that, as we shall explain, the arbitrator ultimately found that the jeep trail referenced in the Original Jeep Trail Agreement cut into, and then out of, the Riverfront Easement area as the jeep trail made its way between Lot 2 and Morgan Station Road.[6]

A little over a year after the conveyance of Lot 1, Ryan and Jekel executed and recorded another easement agreement (the "Second Jeep Trail Agreement"), which, like the Original Jeep Trail Agreement, was titled "Declaration for Ingress and Egress Easement (Driveway) and Maintenance Agreement." It provided: "An easement is established over the existing jeep trails located on Lot 1." Moreover, the Second Jeep Trail Agreement expressly stated that it "replaces absolutely and in its entirety" the Original Jeep Trail Agreement. Nevertheless, it largely tracked the language of the Original Jeep Trail Agreement, including the statements that the easement was "perpetual" and was for the purpose of "ingress and egress," and the requirement that any disputes be resolved by arbitration. However, unlike the Original Jeep Trail Agreement, it did not explicitly describe the jeep trails as connecting to Morgan Station Road or to the Sharp Lot. The Second Jeep Trail Agreement again identified the jeep trails by reference to the Health Department Plan, but also by reference to a "new road approved by the State of Maryland Department of the Environment Water Management Administration, April 25, 1996, permit 94–NT–1072–1994468197" (the "MDE Per-

---

6. The Riverfront Easement was the subject of much dispute among the parties, but none of the issues that directly pertain to the Riverfront Easement has been raised on appeal.

mit").[7]

In 1997, Jekel conveyed Lot 1 (the Downey Lot) to Larry and Wendy Raskin. In turn, by a deed dated December 15, 2000, the Raskins conveyed Lot 1 to appellees.

On December 13, 2002, in the Circuit Court for Howard County, appellees filed a three-count "Complaint for Declaratory Judgment," naming as defendants Jack Ryan, Inc., as well as John E. Ryan and Pamela Jekel Ryan individually, and seeking resolution of several disputes regarding the adjoining properties. Pertinent to this appeal,[8] the second count of the Complaint alleged that Ryan had constructed a driveway on Lot 1 "located outside the easement area," as described in the Second Jeep Trail Agreement. Therefore, appellees sought a judicial declaration that Ryan was "under an obligation to relocate the driveway serving the [Sharp Lot] to conform" to the Second Jeep Trail Agreement.

In the course of the litigation, appellees filed five amended complaints. On September 4, 2003, during the litigation, appellant purchased Lot 2 (the Sharp Lot) from Ryan. As a result, appellees added Sharp as a defendant to their suit. Appellant filed a counter complaint, as did other defendants (including Ryan, as well as the Breslins, a couple who owned

---

**7.** A copy of the MDE Permit is included in the record extract. The permit itself is a one-page document that granted Ryan permission "[t]o construct a driveway, approximately 690–foot long, through the 100–year floodplain of the South Branch of the Patapsco River to provide primary access to homesites located west of Morgan Station Road. The final driveway elevation will be equal to the existing elevation of the unimproved access." The MDE Permit did not specifically articulate the location of the "driveway." The record extract also contains a "Joint Permit Application," which Ryan apparently submitted to obtain the MDE Permit. It includes a drawing showing the "proposed access driveway."

**8.** We need not recount the entire tortured history of the litigation, as it is not relevant to the issues on appeal. *Washington v. State,* 180 Md.App. 458, 461 n. 2, 951 A.2d 885 (2008); *Singfield v. State,* 172 Md.App. 168, 170, 913 A.2d 671 (2006), *cert. denied,* 398 Md. 316, 920 A.2d 1060 (2007).

another neighboring parcel and had been named as defendants by the Downeys with respect to claims not at issue here).[9]

Before Sharp purchased Lot 2 and entered the lawsuit, Ryan filed a "Motion to Dismiss Count II and to Compel Arbitration." Ryan cited the language of the Second Jeep Trail Agreement calling for resolution by arbitration of disagreements relative to "any . . . issue" concerning the easement, and asked the court to dismiss the second count and to "order [appellees] to initiate the arbitration process." Noting that appellees "indicated that they do not oppose the Motion," the court granted Ryan's motion on May 15, 2003.

In the summer of 2003, Ryan and the Downeys began a binding arbitration proceeding to resolve the claims at issue in the Downeys' original "Count II." After Sharp purchased Lot 2 from Ryan, he joined in that arbitration proceeding.

Subsequently, in July 2007, Ryan and Jekel and their associated entities were dismissed from the lawsuit by a joint stipulation that resolved all claims by and against them. By "Order" entered on September 11, 2007, the circuit court required Sharp and the Downeys to arbitrate in the pending arbitration proceeding their disputes relative to the "Second Jeep Trail Agreement." On January 16, 2008, pursuant to an agreement by Sharp and the Downeys, the court entered an Order dismissing the remaining claims between them, and ordering Sharp and the Downeys to submit those claims (which are wholly separate from the issues on appeal) to the arbitrator. Later that month, the Downeys and the Breslins reached a settlement agreement resolving their disputes (which also are not relevant to this appeal). Accordingly, pursuant to joint motions of the parties, the circuit court entered orders dismissing all remaining claims relative to all

---

9. Notably, one count of Ryan's counter complaint sought $25,000 in damages from the Downeys due to a "continued pattern of harassing action" that Ryan alleged had caused a prospective buyer of Lot 2 (apparently Sharp) to "indicate[ ] that, because of the . . . Downeys' harassing actions . . . the buyer would only go forward with the contract if the price were reduced" by $25,000.

remaining parties. On March 26, 2008, the circuit court entered an order directing the clerk to close the case.

The arbitration proceeding at issue here began in January 2008.[10] The arbitrator heard testimony, received documentary exhibits, and conducted two site visits to the properties. Notably, the proceedings before the arbitrator were not transcribed.

On January 6, 2009, the arbitrator issued his Award, in which he recounted the history of the land transactions relative to the two lots. The arbitrator also explained that before Ryan divided his property into the Sharp Lot and the Downey Lot, he had begun "to improve the jeep trail without the necessary government permits regulating flood plain tidal and non-tidal waterways." The arbitrator continued:

> On July 9, 1994, Ryan was ordered to stop such activity. Ryan then filed a Joint Permit application with an attached plat that showed the Jeep Trail. Thereafter, a Letter of Authorization (After–the–Fact) was issued effective May 22, 1995. A dispute arose between Verba O. Day [another neighbor] and Ryan over Ryan's use of Day's right-of-way to access Morgan Station Road. To avoid the conflict, Ryan filed a petition to modify the permit to bypass Day's right-of-way. . . . (Internal citations omitted.)

The arbitrator also observed that the Health Department Plan, referenced in both the Original and the Second Jeep Trail Agreement, indicated the "Ex[isting] Jeep Trail" with a "darker broken black line." In his decision regarding the issues pertinent to this appeal, the arbitrator placed great reliance on the Health Department Plan's depiction of the jeep trail. The arbitrator said:

> There are three issues concerning the Jeep Trails Easement, namely, whether the easement extended to Morgan

---

**10.** Although Ryan and the Downeys initially began the arbitration in the summer of 2003, the proceedings were delayed by settlement negotiations and subsequent collateral litigation in the circuit court proceeding, which caused the parties to hold the arbitration in abeyance for several years.

Station Road, whether the easement extended to Lot 2, and whether the driveway as it now exists is the easement created by the [Second Jeep Trail Agreement].

A careful examination of the Health Department [Plan] discloses that the easement does not extend to Morgan Station Road but connected to the Verba O. Day right of way to access Morgan Station Road. When Day disputed Ryan's use of her right of way, Ryan filed for a modified permit to bypass the Day right-of-way. The permit was granted effective April 25, 1996. The plat filed with the modified permit application showed the "proposed access driveway" parallel and to the north of the Day right-of-way.

The "proposed access driveway" to Morgan Station Road was not built at the location shown [on] the plat attached to Ryan's [MDE] Permit, but ... connected to the driveway of the Howard County Bus Turnaround. There was no permit to reflect this, nor was there any amendment to the [Second Jeep Trail Agreement] to reflect this. Consequently, the easement created by the [Second Jeep Trail Agreement] does not extend to Morgan State [sic] Road.

The second issue, whether the Jeep Trails Easement extends to Lot 2, also invites the close examination of the Health Department Plan. [The Downeys' version of the Health Department Plan] shows the Jeep Trail Easement going in a northwesterly direction, i.e. traveling away from Morgan Station Road over Lot 1, through Lot 2, then owned by Ryan, through the ... Riverfront Easement, then curving toward the south and re-entering Lot 1, but stopping short of Lot 2. [Sharp's version of the Health Department Plan] shows the path of the same Jeep Trail, but instead of stopping short of Lot 2 [the trail] extends into Lot 2.

The Downeys argue that the existing Jeep Trail did not extend to Lot 2 ..., but fell short of Lot 2. ... Of course, the primary purpose of the Health Department [Plan] was to determine the location of the proposed wells and septic systems. The Jeep Trail was not determined by a metes and bounds description and, for the most part, simply followed the contour lines on the Health Department Plan.

The Health Department Plan is dated November 11, 1991. The first recorded evidence of the Jeep Trail easement occurred on February 20, 1996 when Ryan created Lot 1 and Lot 2, conveyed Lot 1 to Jeckel [sic], . . . and created with Jekel "the existing Jeep Trail" Easement [*i.e.*, the Original Jeep Trail Agreement].

The pertinent language of the [Original Jeep Trail Agreement] reads:

"1. An easement is established over the existing Jeep Trail located on Lot 1, but which is not described in a metes and bounds description for the mutual use of both lots. The beginning of the Easement at Morgan Station Road is at the driveway which is used in common with 430 Morgan Station Road and ends at the northeast boundary of Lot 2," and as "shown on an unrecorded plat, Health Department Percolation Certification Plan, Project No. 423, dated November 11, 1991."

The [Original Jeep Trail Agreement] also stated that the easement "ends at the northeast boundary of Lot 2. . . ." The easement stops at the division line of Lot 1 and 2 and does not enter Lot 2.

On February 27, 1997, Jeckel [sic] and Ryan executed the [Second Jeep Trail Agreement] that replaced absolutely and in its entirety the [Original Jeep Trail Agreement]. This instrument established an easement "over the existing jeep trails located on Lot 1["] as ["]shown on the Howard County Health Department Certification Plan" and the "new road" approved by Maryland Water Management permit 94–NT–1072/199468197. Since the prior easement was entirely replaced, this [Second Jeep Trail Agreement] is the sole controlling extant easement and limits the easement to the "existing jeep trails located on Lot 1" of which none give access to Lot 2, the Riverfront Easement, nor to Morgan Station Road.

The remaining issue is whether the existing driveway is located within the Jeep Trails Easement. As stated before, the Jeep Trails Easement does not extend to Morgan Station Road, nor was it built in accordance with the permit

94–NT–1072/199468197 as modified, nor does the easement extend into Lot 2. The above, together with . . . other evidence shows substantial parts of the driveway were not built within the easement designations. (Internal citations omitted.)

The arbitrator also rejected a claim by Sharp that, if he did not have an express easement, he nevertheless was entitled to an implied easement. The arbitrator reasoned:

Sharp contends that since he is landlocked, he has an implied easement by necessity. When Ryan created Lot 1 and 2, he immediately sold Lot 1 to Jeckel [sic], [and] created with Jeckel [sic] the Riverfront Easement, then the [Original Jeep Trail Agreement]. All of the above instruments were executed on the same day and recorded among the Land Records of Howard County. . . . The [Original Jeep Trail Agreement] gave an easement through Lot 1 to Ryan, but it did not extend into Lot 2, the Riverfront Easement, or Morgan Station Road. Obviously, Jeckel [sic] did not want any intrusion into her Riverfront Easement.[11] Ordinarily, subsequent instruments should not be considered. Here, however, the [Original Jeep Trail Agreement] was substituted by the [Second Jeep Trail Agreement] by the same parties and concerned the same property and . . . also was recorded. This easement did not extend into Lot 2 to cross into the Riverfront Easement nor to Morgan Station Road. This is the operative easement and, once again, it is apparent that Jeckel [sic] did not want her easement rights disturbed. Ryan, now Sharp, does not have an implied easement by necessity. (Internal citations omitted.)

With respect to the instant dispute, the arbitrator made the following "Decision and Findings":

---

11. In another portion of the Award, the arbitrator made findings, which appellant does not contest, that "[t]he Downeys may maintain and use the Riverfront Easement Area for any purpose for the use and benefit of Lot 1 and Sharp may not interfere with the Downey's [sic] use of the Riverfront Easement in any way."

5. The "Jeep Trails" over which Sharp has an easement are only those depicted on the Health Department Percolation Certification Plan dated November 11, 1991, and as permitted by the Maryland Department of Natural Resources Permit No. 94–NT–1072/199468197 (as modified).

6. The "Jeep Trails" do not provide Sharp access to Morgan Station Road[.]

7. The portions of the paved driveway are not located within the Jeep Trails defined by the [Second Jeep Trail Agreement], and/or extend beyond the 690 feet permitted by the [MDE] Permit, and may be removed by the Downeys. (Internal citations omitted.)

By letter dated January 13, 2009, the arbitrator advised the parties that the final sentence of the Award's discussion of easement by necessity "should read, 'Ryan, now Sharp, does not have an implied easement by necessity, *he does not need one.*'" (Emphasis added to show addition.)

On January 20, 2009, Sharp filed with the arbitrator a "Motion to Reconsider, Modify or Correct Arbitration Award," in which he asked the arbitrator to reconsider his three "Findings," numbered 5, 6, and 7, relating to the Second Jeep Trail Agreement. Sharp did not challenge five other findings of the arbitrator, which related to issues that are not the subject of this appeal.

In the meantime, on January 15, 2009, appellees reopened the circuit court case by filing a "Petition to Confirm Arbitration Award." Appellant responded with an answer to appellees' petition, as well as a "Petition to Vacate Arbitration Award." In these papers, appellant advised the court that he had filed his Motion to Reconsider with the arbitrator on January 20, 2009. According to appellant, appellees' petition to confirm the Award was "premature," because "Section 3–222 of the Courts and Judicial Proceedings Article provides a period of twenty (20) days to file a motion to modify or vacate the award with the arbitrator." Therefore, Sharp contended that "[n]either [appellant's] Petition nor the Petition to Confirm Award should be heard until the arbitrator completes his

task by ruling on the Motion to Reconsider," and indicated that he was filing his Petition to Vacate Arbitration Award "in an excess of caution." Appellant asked the court to stay action on the competing petitions until the arbitrator ruled on his Motion to Reconsider.

Although the court did not issue a formal stay, it took no immediate action on the two petitions. On March 30, 2009, the arbitrator denied appellant's Motion to Reconsider. In his "Ruling & Order on Motion of Respondent," the arbitrator stated:

> There were three issues relative to the "existing Jeep Trails on Lot 1," namely, whether the easement extended to Morgan Station Road, whether it extended to Lot 2, and whether the driveway as it now exists is the easement created by the [Second Jeep Trail Agreement].

> As to the first issue, the easement did not extend to Morgan Station Road. The easement was not built in accordance with the plat attached to the [MDE] Permit.... Instead, it was built to connect to the Howard County school bus turnaround. There was no permit to do this. The (after the fact) authorization required "grading and fill associated with improvements to a school bus turnaround." It was not an authorization to connect to the school bus turnaround, but merely to improve the school bus turnaround.

> As stated in the Arbitration Award, the [Second Jeep Trail Agreement] is the controlling easement. It gave no access to Lot 2, the Riverfront Easement, nor Morgan Station Road. In short, Lot 2 has no access to Morgan Station Road since Lot 2 does not have access either to the Riverfront Easement or Lot 1 from Lot 2, and therefore cannot cross Lot 1 to gain access to Morgan Station Road.

> The Downey's [sic] own Lot 1 in fee simple unencumbered by the [Second Jeep Trail Agreement] and unencumbered by the replaced [Original Jeep Trail Agreement].

Since the owner of Lot 2, presently Sharp, cannot traverse or cross Lot 1, Sharp has no access to Morgan Station Road. Lot 2 is landlocked.

Relative to the remaining issue, the location of the driveway on Lot 1, such is no longer the concern of the owner of Lot 2, presently Sharp. (Internal citations omitted.)

On April 7, 2009, appellees filed a "Memorandum in Further Support of Petition to Confirm Arbitration Award" in the circuit court. On April 28, 2009, appellant filed a "Further Petition and Memorandum to Vacate Arbitration Award."

In brief, appellant contended that the Arbitration Award was "irrational" and displayed a "manifest disregard of the law." In Sharp's view, the arbitrator illogically "failed to actually locate the 'new road' referred to in the Jeep Trails Easement when the location was shown on exhibits referred to in the Award." Further, appellant argued that, "if the easement was not locatable by the Declaration of Easement, it must be presumed to be in the location the parties constructed their driveway." Additionally, Sharp maintained that the Downeys "took title to Lot 1 subject to the known and clearly visible easement for the existing driveway clearly visible to them on the ground." Finally, Sharp disputed the arbitrator's statement that an implied easement was "not needed," arguing: "The finding of no implied easement, because it was 'not needed', leaves Lot 2 landlocked, clearly an arbitrary, irrational decision in manifest disregard of the law. Such clearly was not the intention of Jekel and Ryan when they expressly created the two easement documents for ingress and egress."

On September 28, 2009, the court entered a Memorandum Opinion and Order, confirming the Award. It recognized that "Maryland law favors the resolution of legal disputes through binding arbitration as evidenced by the codification of the Maryland Uniform Arbitration Act...." The court also explained that "the Act severely limits the Court's authority to vacate an arbitration award," and that, "[t]o prevent a reviewing court from substituting its judgment for the decision of the arbitrator, a court *'shall not* vacate the award or refuse to

confirm the award on the ground that a court of law or equity could not or would not grant the same relief.'" (Quoting statute; circuit court's emphasis). Nevertheless, the circuit court recognized case law for the proposition that "arbitrators 'exceed[ ] their powers' when they reach a completely irrational result," *O–S Corp. v. Samuel A. Kroll, Inc.*, 29 Md.App. 406, 409, 348 A.2d 870 (1975), *cert. denied*, 277 Md. 740 (1976), and that an arbitrator's award may be vacated where it displays "'manifest disregard of the law,'" which is "'something beyond and different from a mere error in the law or failure on the part of the arbitrator[ ] to understand or apply the law.'" *Board of Educ. of Prince George's County v. Prince George's County Educators' Ass'n, Inc.*, 309 Md. 85, 102, 522 A.2d 931 (1987) (citation omitted).

The circuit court concluded that the arbitrator "completely, and rationally, adjudicated all issues presented in the arbitration proceedings." The court explained:

> The arbitrator reasoned based on careful analysis of the[ ] land records and weighing of testimony and evidence that the existing Jeep Trails Easement did not extend to Morgan Station Road and did not provide [Sharp] access to Morgan Station Road. The evidence before the arbitrator included the fact that the existing driveway was not built in accordance with the Modified Permit or the joint application's proposed driveway.
>
> Furthermore, the arbitrator was not obligated to consider the proposed access driveway contained in the joint application because, contrary to [Sharp's] assertion, the proposals were not incorporated into the Jeep Trails Easement or the Modified Permit.... As such, it was reasonable for the arbitrator to locate the Jeep Trails Easement ... based upon the accepted controlling documents to find that the easement did not provide [Sharp] access to Morgan Station Road.

The court also rejected appellant's assertion that the easement should be "presumed" to be located where Ryan had physically placed his driveway, stating:

[T]he parties' predecessors-in-interest granted a way with a fixed location found in the Modified Permit. While an easement was intended, the [Downeys] should not be burdened by the unapproved existing driveway because the parties' predecessors-in-interest elected not to comply with the recorded Jeep Trails Easement and follow the Modified Permit for the access road.

In denying Sharp's claim that the Downeys should be burdened by the easement because it was readily apparent "on the ground," the court observed that "whether an unrecorded easement is apparent to a purchaser is a fact determination." In the court's view, the arbitrator's conclusion that no easement supported the existing driveway was "reasonable ... based upon the record ... which includes evidence that [Sharp] purchased his property with knowledge that [the Downeys] had a pending declaratory judgment action against the predecessor-in-title, Jack Ryan, regarding the land." The court declined to "substitute" its judgment for "the judgment of the arbitrator."

Finally, the court rejected Sharp's claim "that an implied easement is necessary to keep his land from being landlocked and that such a finding is supported by Maryland law." The court stated: "An owner may freely cut off access to his land." For that proposition, it cited *Shpak v. Oletsky,* 280 Md. 355, 371, 373 A.2d 1234 (1977). The court explained that, in the arbitrator's view, "[t]he parties' predecessors-in-interest created an easement involving the Jeep Trails, but ... did not extend it into [appellant's] property (Lot 2), the Riverfront Easement, or Morgan Station Road, leaving [appellant] landlocked." Finding no error in the arbitrator's determination, the circuit court reasoned:

The necessity to access [Sharp's] property and Morgan Station Road did not exist at the time of severance of title as evidenced by the boundaries of the easement agreements, preventing a finding of an implied easement by necessity. This lack of necessity is also reflected in [appellant's] purchase of the property at a reduced rate based upon knowledge that [appellees] were challenging the existence of

encumbrances to the land. It is reasonable to conclude that [Sharp] purchased the land with the understanding that any easements may not be valid or upheld.

Accordingly, the court entered its "Order" granting the Downeys' Petition to Confirm Arbitration Award and denying Sharp's competing Petition to Vacate Arbitration Award. This appeal followed.

## DISCUSSION

As the circuit court correctly recognized, this case is governed by the Maryland Uniform Arbitration Act (the "Act"), codified in Md.Code (2006 Repl.Vol., 2010 Supp.), §§ 3–201 *et seq.* of the Courts & Judicial Proceedings Article ("C.J."). The Act is an expression of Maryland's " 'strong legislative policy favoring enforcement of arbitration agreements.' " *Louis Fireison & Assocs., P.A. v. Alkire*, 195 Md. App. 461, 471, 6 A.3d 945 (2010) (quoting *All State Home Mortg., Inc. v. Daniel*, 187 Md.App. 166, 178, 977 A.2d 438, *cert. denied*, 410 Md. 560, 979 A.2d 707 (2009)). *See also Questar Homes of Avalon, LLC v. Pillar Constr., Inc.*, 388 Md. 675, 684, 882 A.2d 288 (2005).[12]

---

**12.** As its name suggests, the Maryland Uniform Arbitration Act is Maryland's version of the Uniform Arbitration Act ("UAA"), 7 U.L.A. 105 (Master ed.2009), a uniform law promulgated in 1956 by the National Conference of Commissioners on Uniform State Laws and by the American Bar Association. However, Maryland's enactment differs in certain respects from the UAA. *See generally Wilson v. McGrow, Pridgeon & Co.*, 298 Md. 66, 71–78, 467 A.2d 1025 (1983). The Maryland Act was "meant to mirror the language" of the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 *et seq.* (2006), and " 'has been called the "State analogue" ' " to the FAA. *Walther v. Sovereign Bank*, 386 Md. 412, 423–24, 872 A.2d 735 (2005) (citations omitted). The FAA's statutory grounds to vacate an award, *see* 9 U.S.C. § 10, are largely the same as the Maryland Act's standards, enumerated in C.J. § 3–224(b), with the exception of the omission in the FAA of the ground specified in C.J. § 3–224(b)(5).

The Act counsels that we look to the law of other jurisdictions as well as our own, by providing that it "shall be so interpreted and construed as to effectuate its general purposes to make uniform the law of the states which enact it." C.J. § 3–232. Thus, Maryland courts ordinarily " 'rely on decisions interpreting the [FAA]' " when interpreting corre-

In *Mandl v. Bailey,* 159 Md.App. 64, 82–83, 858 A.2d 508 (2004), the Court explained:

Arbitration is the process by which parties voluntarily agree to substitute a private tribunal for an otherwise available public tribunal to decide specified disputes. *Cheek v. United Healthcare of the Mid–Atlantic, Inc.,* 378 Md. 139, 146 [835 A.2d 656] (2003) (citing *Gold Coast Mall, Inc. v. Larmar Corp.,* 298 Md. 96, 103 [468 A.2d 91] (1983)). Arbitration is encouraged in Maryland because it provides an informal, expeditious, and inexpensive alternative to conventional litigation. *RTKL Assocs., Inc. v. Baltimore Co.,* 147 Md.App. 647, 656 [810 A.2d 512] (2002).

The obligation to arbitrate is a creature of contract. *Howsam v. Dean Witter Reynolds, Inc.,* 537 U.S. 79, 83 [123 S.Ct. 588, 154 L.Ed.2d 491] (2002); *Cheek, supra,* 378 Md. at 147 [835 A.2d 656]; *C.W. Jackson & Assocs., Inc. v. Brooks,* 289 Md. 658, 666 [426 A.2d 378] (1981). A party cannot be compelled to submit a dispute to arbitration unless he has agreed to do so. *Wells v. Chevy Chase Bank, F.S.B.,* 363 Md. 232, 249 [768 A.2d 620] (2001); *Curtis G. Testerman Co. v. Buck,* 340 Md. 569, 579 [667 A.2d 649] (1995). . . .

Also, because private arbitration is a matter of contract, an arbitrator derives his power from the arbitration agreement itself. *MCR of Am., Inc. v. Greene,* 148 Md.App. 91, 111–12 [811 A.2d 331] (2002). The parties delineate the extent of the arbitrator's authority by the scope of their agreement to arbitrate and submission to arbitration. *Id.* at 112 [811 A.2d 331]; *Barclay Townhouse Assocs. v. Stephen L. Messersmith,* 67 Md.App. 493, 497 [508 A.2d 507] (1986), [*aff'd,* 313 Md. 652, 547 A.2d 1048 (1988) ]. Maryland law does not restrict arbitration to issues of fact. *Soc'y of Am. Foresters v. Renewable Natural Res. Found.,* 114 Md.App.

sponding provisions of the Act, *id.* at 424, 872 A.2d 735 (citation omitted), and have also found guidance in the case law of our sister jurisdictions interpreting their own versions of the UAA. *See, e.g., Blitz v. Beth Isaac Adas Israel Congregation,* 352 Md. 31, 40–41 & n. 9, 720 A.2d 912 (1998); *Stephen L. Messersmith, Inc. v. Barclay Townhouse Assocs.,* 313 Md. 652, 656, 547 A.2d 1048 n. 1 (1988); *Litton Bionetics, Inc. v. Glen Constr. Co.,* 292 Md. 34, 47–52, 437 A.2d 208 (1981).

224, 235 [689 A.2d 662] (1997) (quoting *Contract Constr., Inc. v. Power Technology Ctr. Ltd. P'ship,* 100 Md.App. 173, 185 [640 A.2d 251], [*cert. denied,* 336 Md. 301, 648 A.2d 203] (1994)). Unless the parties agree otherwise, issues of fact *and* law are submitted to the arbitrator for decision. *Soc'y of Am. Foresters, supra,* 114 Md.App. at 235 [689 A.2d 662]. (Emphasis in original.)

■ Where the parties have agreed to submit a dispute to binding arbitration, the Act gives "the courts jurisdiction to enforce arbitration agreements and enter judgments on arbitration awards." *Questar Homes,* 388 Md. at 684, 882 A.2d 288. The courts are also empowered to determine whether the parties have a valid agreement to arbitrate. C.J. § 3–207. "If a party to an arbitration agreement" that is covered by the Act "refuses to arbitrate, the other party may file a petition with a court to order arbitration." *Id.*

Once an arbitrator has rendered an award, C.J. § 3–227 authorizes either party to file a petition in court to confirm the award. The Act also permits the filing of a petition to vacate an arbitration award "within 30 days after delivery of a copy of the award to the petitioner," or within 30 days after "corruption, fraud, or other undue means" in procuring the award "become known or should have become known to the petitioner." C.J. § 3–224(a).[13] "The court shall confirm the award, unless the other party has filed an application to vacate, modify, or correct the award...." C.J. § 3–227(b).[14]

---

**13.** Under C.J. § 3–223(b), the Act also authorizes a petition to "modify or correct" an award in three circumstances:

(1) There was an evident miscalculation of figures or an evident mistake in the description of any person, thing, or property referred to in the award;

(2) The arbitrators have awarded upon a matter not submitted to them and the award may be corrected without affecting the merits of the decision upon the issues submitted; or

(3) The award is imperfect in a matter of form, not affecting the merits of the controversy.

**14.** If an order confirming the award is entered, the court must enter a judgment "in conformity with the order," which "may be enforced as any other judgment." C.J. § 3–228(a).

■ Notably, the Act contemplates an extremely limited role for the courts in reviewing or countermanding an arbitrator's decision. As we observed in *Mandl,* 159 Md.App. at 85, 858 A.2d 508, "the General Assembly has severely restricted the role the courts play in the arbitration process." Further, we explained: "To prevent the possibility that a reviewing court will substitute its judgment for the decision of the arbitrator, thereby frustrating the purpose of arbitration, the General Assembly has narrowly confined ... the circumstances in which the court has the power to vacate an arbitral award." *Id.*

Under the Act, a court may not vacate an award or refuse to confirm an award "on the ground that a court of law or equity could not or would not grant the same relief." C.J. § 3–224(c). Rather, C.J. § 3–224(b) enumerates limited circumstances in which a court "shall vacate an award":

(1) An award was procured by corruption, fraud, or other undue means;

(2) There was evident partiality by an arbitrator appointed as a neutral, corruption in any arbitrator, or misconduct prejudicing the rights of any party;

(3) The arbitrators exceeded their powers;

(4) The arbitrators refused to postpone the hearing upon sufficient cause being shown for the postponement, refused to hear evidence material to the controversy, or otherwise so conducted the hearing, contrary to the provisions of [C.J.] § 3–213 ..., as to prejudice substantially the rights of a party; or

(5) There was no arbitration agreement as described in [C.J.] § 3–206 ..., the issue was not adversely determined in proceedings under [C.J.] § 3–208 ..., and the party did not participate in the arbitration hearing without raising the objection.

■ When a party to an arbitration proceeding seeks to vacate the arbitrator's award, no matter how "the mistake is characterized, the burden of showing that an award is invalid rests with the party attacking the award." *Baltimore Teach-*

*ers Union, Am. Fed. of Teachers, Local 340 v. Mayor of Baltimore,* 108 Md.App. 167, 181–82, 671 A.2d 80 (citation omitted), *cert. denied,* 342 Md. 472, 677 A.2d 565 (1996). Moreover, "this burden is a heavy one." *Id.* "Courts generally refuse to review arbitration awards on the merits, reasoning that the parties are required 'to submit to the judgment of the tribunal of their own selection and abide by the award.' " *Int'l Ass'n of Firefighters, Local 1619 v. Prince George's County,* 74 Md.App. 438, 444, 538 A.2d 329 (1988) (quoting *Roberts Bros. v. Consumers' Can Co.,* 102 Md. 362, 369, 62 A. 585 (1905)).

In the touchstone case of *O–S Corp. v. Samuel A. Kroll, Inc., supra,* 29 Md.App. at 407–08, 348 A.2d 870, this Court recognized that the Act "restrictively defin[es] the grounds upon which a court might vacate an [arbitration] award, and expressly proscribe[s] any possibility of substitution of a reviewing court's judgment for that of the arbitrators." Nevertheless, the Court recognized that the text of the Act supported a "very limited extension of the reviewing court's scope of review to include authority to vacate an award that is 'completely irrational.' " *Id.* at 409, 348 A.2d 870. Although the "completely irrational" standard derives originally from common law standards of review of arbitration awards that predate the Act, we gleaned "[s]tatutory support" for its application "in the fact that arbitrators 'exceeded their powers' when they reach a completely irrational result, [and] in the connotation of the words 'undue means'. . . ." *Id.* (quoting C.J. § 3–224(b)(1) & (3)).

Thus, the *Kroll* Court held that, "when reviewing the fruits of an arbitrator's award, a judge may withhold only such as were tainted by improbity *or* based on a completely irrational interpretation of the contract." [15] *Id.* at 408–09, 348 A.2d 870 (emphasis in original). Explaining its holding, the Court stated that courts are empowered by the Act to grant relief "from an arbitration award that was arrived at in good faith

---

**15.** The question decided by the arbitrator in *Kroll* was one of contract interpretation. *See Kroll,* 29 Md.App. at 410–11, 348 A.2d 870.

but, because of grossly misguided judgment, is shockingly absurd[.]" *Id.* at 408, 348 A.2d 870.

Notably, the Court made clear that this restrictive standard of review is distinct from, and sets a bar far higher than, the standards of review applicable to the decisions of trial courts or administrative agencies. It stated: "We must judicially accept an arbitrary interpretation of a contract by an arbitrator. We shall vacate a completely irrational one." *Id.* at 410, 348 A.2d 870. Further, the Court said: "[O]ur review ... need not seek a preponderance of the evidence to support the award, nor even substantial evidence. There need only be *some* evidence to meet the test of rationality, *i.e.*, it may be so little as to make the result 'arbitrary', so long as it is not completely irrational." *Id.* at 411, 348 A.2d 870 (emphasis in original).[16]

In addition, we have recognized that the Act's standard for vacatur of an arbitral award where the award was procured by "undue means," C.J. § 3–224(b)(1), or the "arbitra-

---

**16.** In *Stephen L. Messersmith, Inc. v. Barclay Townhouse Assocs.*, 313 Md. 652, 659, 547 A.2d 1048 (1988), the Court of Appeals observed that *Kroll* "and the 'completely irrational' standard discussed therein [have] never been approved by this Court." But, the Court did not overrule *Kroll*, instead noting that "the completely irrational standard of review may or may not represent the proper approach...." *Id.* The standard of review when "the parties indisputably agree to submit to arbitration," *id.*, as in *Kroll*, was not implicated in *Messersmith*, which involved the legal determination of "whether a valid contract to arbitrate existed between the parties" in the first place, a determination the Court held "must be made by a court, not an arbitrator." *Id.* at 661, 547 A.2d 1048.

Since *Messersmith*, the Court has not addressed *Kroll's* authority more definitively, and we have continued to apply our precedent, as stated in *Kroll*. In *MCR of America, Inc. v. Greene*, 148 Md.App. 91, 105–06 & n. 8, 811 A.2d 331 (2002), we observed: "[T]he 'completely irrational' standard ... has not, to date, been adopted by the Court of Appeals.... On the other hand, the Court has never rejected that standard. Until it does, we shall assume its continued vitality in Maryland." *See also Snyder v. Berliner Constr. Co.*, 79 Md.App. 29, 37–39 & n. 2, 555 A.2d 523 (noting that the *Messersmith* Court's statements regarding *Kroll* were "*dicta* " and reviewing arbitrator's construction of substantive contractual provisions under the "completely irrational" standard), *cert. denied*, 316 Md. 550, 560 A.2d 1118 (1989).

**152**

tors exceeded their authority," C.J. § 3–224(b)(3), may encompass reversal of an award that displays "manifest disregard of the law." *See, e.g., Southern Md. Hosp. Ctr. v. Edward M. Crough, Inc.*, 48 Md.App. 401, 407–08, 427 A.2d 1051 (reviewing and affirming arbitrator's award under "manifest disregard of the law" standard and *Kroll* standard), *cert. denied*, 290 Md. 721 (1981); *see also MCR of America, Inc. v. Greene*, 148 Md.App. 91, 120, 811 A.2d 331 (2002); *Birkey Design Group, Inc. v. Egle Nursing Home, Inc.*, 113 Md.App. 261, 266–67, 687 A.2d 256 (1997); *Graceman v. Goldstein*, 93 Md.App. 658, 675–76, 613 A.2d 1049 (1992), *cert. denied*, 329 Md. 336, 619 A.2d 546 (1993).

"Manifest disregard of the law" involves " 'something beyond and different from a mere error in the law or failure on the part of the arbitrators to understand or apply the law.' " *Bd. of Educ. of Prince George's County v. Prince George's County Educators' Ass'n*, 309 Md. 85, 102, 522 A.2d 931 (1987) (citation omitted); *see Southern Md. Hosp. Ctr.*, 48 Md.App. at 407, 427 A.2d 1051. The concept of "manifest disregard of the law" connotes "a 'palpable mistake of law or fact . . . apparent on the face of the award' or a 'mistake so gross as to work manifest injustice'. . . ." *Baltimore Teachers Union*, 108 Md.App. at 181, 671 A.2d 80 (alteration in original; citation omitted). Put another way, it occurs " 'when arbitrators understand and correctly state the law, but proceed to disregard the same.' " *MCR*, 148 Md.App. at 120, 811 A.2d 331 (citation omitted).

As with the "completely irrational" standard, review for "manifest disregard of the law" is strictly circumscribed. "Judicial deference is appropriate unless the arbitrator's award actually violated the law or any explicit, well-defined and dominant public policy." *Birkey Design Group*, 113 Md.App. at 267, 687 A.2d 256. *See MCR*, 148 Md.App. at 120, 811 A.2d 331; *Graceman*, 93 Md.App. at 676, 613 A.2d 1049. To constitute "manifest disregard of the law," an arbitrator's decision must violate a public policy ascertainable " 'by reference to the laws and legal precedents and not from

general considerations of supposed public interests.'" *Amalgamated Transit Union, Div. 1300 v. Mass Transit Admin.,* 305 Md. 380, 389, 504 A.2d 1132 (1986) (citations omitted). *See also Baltimore County v. Mayor of Baltimore,* 329 Md. 692, 702, 621 A.2d 864 (1993); *Int'l Ass'n of Firefighters, Local 1619,* 74 Md.App. at 449–50, 538 A.2d 329.

The Court of Appeals has not expressly adopted review for "manifest disregard of the law" in cases arising under the Act. But, in *Prince George's County Educators' Ass'n,* 309 Md. at 98, 522 A.2d 931, the Court reviewed an arbitrator's award in a case for which the Act did not apply, and utilized the "manifest disregard of the law" standard as a matter of common law. The Court said: "Since ... the Maryland Uniform Arbitration Act is not applicable to the instant arbitration award, we need not and do not decide whether an arbitration award subject to the Uniform Act may be vacated ... for 'manifest disregard' of the law." *Id.* at 105, 522 A.2d 931. Nevertheless, the Court stated that "an arbitration award which is contrary to a clear public policy will not be enforced." *Id.* at 100, 522 A.2d 931. It also cited cases from other states applying the "manifest disregard" standard in matters arising under their versions of the UAA, and federal cases applying the standard in review of arbitration awards under the FAA. *Id.* at 102–05, 522 A.2d 931.

The "manifest disregard" standard derives from *Wilko v. Swan,* 346 U.S. 427, 436–37, 74 S.Ct. 182, 98 L.Ed. 168 (1953), a case arising under the FAA. There, the Supreme Court said that "the interpretations of the law by the arbitrators[,] in contrast to manifest disregard [of the law,] are not subject, in the federal courts, to judicial review for error in interpretation." [17] *See also First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 942, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). However, a recent decision of the Supreme Court in *Hall*

---

**17.** *Wilko* determined that § 14 of the Securities Act of 1933 barred agreements to arbitrate claims of violations of that act. 346 U.S. at 438, 74 S.Ct. 182. That decision was later overruled by *Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 484–86, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989).

*Street Associates, L.L.C. v. Mattel, Inc.,* 552 U.S. 576, 128 S.Ct. 1396, 170 L.Ed.2d 254 (2008), has cast doubt on the viability of "manifest disregard of the law" as a ground for vacatur of an arbitral award under the FAA.

*Hall Street,* 552 U.S. at 579, 128 S.Ct. 1396, began as a lease dispute between Hall Street, the landlord, and Mattel, the tenant. The parties agreed to arbitrate their dispute, and drafted an arbitration agreement that provided, in part, that a court " 'shall vacate, modify or correct any award . . . where the arbitrator's conclusions of law are erroneous.' " *Id.* (quoting agreement). An arbitration award was made in favor of Mattel, but Hall Street successfully urged the federal district court to vacate the award for "legal error." *Id.* at 580, 128 S.Ct. 1396. After the Ninth Circuit reversed, the Supreme Court granted certiorari to determine whether the FAA's statutory grounds for vacatur "may be supplemented by contract." *Id.* at 578, 128 S.Ct. 1396. It recognized a split in the appellate courts "over the exclusiveness of [the FAA's] statutory grounds . . . with some saying the recitations are exclusive, and others regarding them as mere threshold provisions open to expansion by agreement." *Id.* at 583, 128 S.Ct. 1396. The Supreme Court expressly held "that the statutory grounds are exclusive." *Id.* at 578, 128 S.Ct. 1396.

In particular, the landlord unsuccessfully argued "that the grounds set out for vacating or modifying an award are not exclusive, taking the position . . . that expandable judicial review authority has been accepted as the law since *Wilko* . . . ." *Id.* at 584, 128 S.Ct. 1396. As the Supreme Court explained, "Hall Street reads [*Wilko* ] as recognizing 'manifest disregard of the law' as a further ground for vacatur on top of those listed in § 10 [of the FAA], and some Circuits have read it the same way. Hall Street sees this supposed addition to § 10 as the camel's nose: if judges can add grounds to vacate (or modify), so can contracting parties." *Id.* at 584–85, 128 S.Ct. 1396 (citations omitted). The Supreme Court rejected this view, however. "Quite apart from its leap from a supposed judicial expansion by interpretation to a private expansion by contract," said the Court, "Hall Street overlooks the

fact that the statement [from *Wilko* ] it relies on expressly rejects just what Hall Street asks for here, general review for an arbitrator's legal errors." *Id.* at 585, 128 S.Ct. 1396.

The Supreme Court opined that, even if the parties agree otherwise, "the text [of the FAA] compels a reading of the [statutory] categories as exclusive." *Id.* at 586, 128 S.Ct. 1396. In its view, the FAA "carries no hint of flexibility" as to expansion of the grounds for vacatur. *Id.* at 587, 128 S.Ct. 1396. The Court reasoned, *id.* at 585, 128 S.Ct. 1396 (citations omitted):

> Maybe the term "manifest disregard" was meant to name a new ground for review, but maybe it merely referred to the § 10 grounds collectively, rather than adding to them. Or, as some courts have thought, "manifest disregard" may have been shorthand for . . . the paragraphs authorizing vacatur when the arbitrators were "guilty of misconduct" or "exceeded their powers." We, when speaking as a Court, have merely taken the *Wilko* language as we found it, without embellishment, and now that its meaning is implicated, we see no reason to accord it the significance that Hall Street urges.

In the wake of *Hall Street,* a lively debate has ensued in the federal circuit courts of appeal over the continued vitality of the "manifest disregard of the law" standard. Some circuits have taken the view that because *Hall Street* holds that the FAA's statutory grounds are "exclusive," it follows that "manifest disregard" is no longer viable. *See Citigroup Global Markets Inc. v. Bacon,* 562 F.3d 349, 350 & 355–58 (5th Cir.2009) ("[M]anifest disregard of the law is no longer an independent ground for vacating arbitration awards under the FAA."); *Medicine Shoppe Int'l, Inc. v. Turner Investments, Inc.,* 614 F.3d 485, 489 (8th Cir.2010) (citing *Hall Street* for the proposition that a "claim that the arbitrator disregarded the law" is "not cognizable"); *Frazier v. CitiFinancial Corp., LLC,* 604 F.3d 1313, 1322–24 (11th Cir.2010) (stating that prior circuit precedent had recognized "manifest disregard" as a "non-statutory ground[ ] for vacatur," but holding that "our judicially-created bases for vacatur are no longer valid in light

of *Hall Street* "); *Ramos–Santiago v. United Parcel Serv.*, 524 F.3d 120, 124 n. 3 (1st Cir.2008) (opining, in a non-FAA case, that *Hall Street's* "holding" is that "manifest disregard of the law is not a valid ground for vacating or modifying an arbitral award in cases brought under the … FAA"). *But see Kashner Davidson Sec. Corp. v. Mscisz*, 601 F.3d 19, 22–23 (1st Cir.2010) (declining to recall mandate in case holding arbitrator manifestly disregarded the law, describing *Ramos–Santiago's* discussion as "dicta," and stating that First Circuit has "not squarely determined whether our manifest disregard case law can be reconciled with *Hall Street* ").

Yet, other circuits have looked to *Hall Street's* description of "manifest disregard" as referring to the FAA statutory grounds "collectively," or as "shorthand" for particular statutory grounds, expressing the opinion that review for "manifest disregard" remains sound. *See Stolt–Nielsen SA v. Animal-Feeds Int'l Corp.*, 548 F.3d 85, 93–95 (2d Cir.2008), *rev'd on other grounds,* 559 U.S. ——, 130 S.Ct. 1758, 176 L.Ed.2d 605 (2010); *Comedy Club, Inc. v. Improv West Assocs.*, 553 F.3d 1277, 1281 & 1289–90 (9th Cir.), *cert. denied,* 558 U.S. ——, 130 S.Ct. 145, 175 L.Ed.2d 36 (2009).[18] Still others have recognized the open question, without resolving it. *See, e.g., MCI Constructors, LLC v. City of Greensboro*, 610 F.3d 849, 857 & n. 5 (4th Cir.2010) (declining to decide whether "mani-

---

**18.** We point out that some circuits cited an unpublished decision, *Coffee Beanery, Ltd. v. WW, L.L.C.*, 300 Fed.Appx. 415, 418–19 (6th Cir.2008), *cert. denied,* 558 U.S. ——, 130 S.Ct. 81, 175 L.Ed.2d 28 (2009), in which a Sixth Circuit panel opined that *Hall Street* "did not foreclose federal courts' review for an arbitrator's manifest disregard of the law," and concluded that it "will follow its well-established precedent here and continue to employ the 'manifest disregard' standard." *See, e.g., Citigroup Global Markets,* 562 F.3d at 356 (citing *Coffee Beanery* ); *Frazier,* 604 F.3d at 1324 (same). In a later Sixth Circuit decision, *Grain v. Trinity Health,* 551 F.3d 374, 380 (6th Cir.2008), *cert. denied,* 558 U.S. ——, 130 S.Ct. 96, 175 L.Ed.2d 30 (2009), that court said that *Hall Street* "casts some doubt on the continuing vitality" of manifest disregard standard for vacatur, but rejected a party's argument for doubling of an arbitrator's monetary award because, "either way, we have used the 'manifest disregard' standard only to vacate arbitration awards, not to modify them."

fest disregard" survives *Hall Street,* where arbitrator did not manifestly disregard the law).[19]

Of import here, the Supreme Court recently reviewed the Second Circuit's decision in *Stolt–Nielsen, supra,* 548 F.3d 85. The Supreme Court assumed that the "manifest disregard" standard applied and declined to resolve the controversy. It said: "We do not decide whether 'manifest disregard' survives our decision in *Hall Street* . . . as an independent ground for review or as a judicial gloss on the enumerated grounds for vacatur set forth at 9 U.S.C. § 10. . . . Assuming, *arguendo,* that such a standard applies, we find it satisfied. . . ." *Stolt–Nielsen SA v. AnimalFeeds Int'l Corp.,* 559 U.S. ——, —— n. 3, 130 S.Ct. 1758, 1768 n. 3, 176 L.Ed.2d 605 (2010). In its view, the arbitration panel improperly "imposed its own policy choice and thus exceeded its powers." *Id.* at ——, 130 S.Ct. at 1770.

We recognize that the issue remains unsettled. But, for several reasons, we decline to reconsider whether "manifest disregard of the law" remains a viable basis to vacate an arbitral award under the Maryland Act. First, neither *Hall Street* nor *Stolt–Nielsen* squarely states that "manifest disregard" is no longer viable. Moreover, the case *sub judice* arises under the Maryland Act, not the FAA; regardless of *Hall Street's* import for review of arbitral awards under the FAA, it has only persuasive value in interpreting Maryland's Act. In addition, this Court's case law on "manifest disregard" has never been overruled by the Court of Appeals. Therefore, the well settled principles of *stare decisis* apply here.[20]

---

19. Other circuits that have declined thus far to resolve the question have done so in unreported opinions. *See, e.g., Andorra Servs., Inc. v. Venfleet, Ltd.,* 355 Fed.Appx. 622, 627–28 & n. 6 (3d Cir.2009); *Legacy Trading Co. v. Hoffman,* 363 Fed.Appx. 633, 635 n. 2 (10th Cir.2010); *Regnery Publ'g, Inc. v. Miniter,* 368 Fed.Appx. 148, 149 (D.C.Cir.2010).

20. In *DRD Pool Service, Inc. v. Freed,* 416 Md. 46, 5 A.3d 45 (2010), the Court of Appeals reiterated that *"stare decisis* means 'to stand by the thing decided,' and is 'the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual

It is also salient that our earlier decisions align with those of several federal courts, *see Stolt–Nielsen, supra,* 548 F.3d 85; *Comedy Club, supra,* 553 F.3d 1277, which, after *Hall Street,* viewed "manifest disregard" as a "shorthand" or "collective" expression for enumerated statutory grounds for vacatur (specifically, C.J. § 3–224(b)(1) and (3) in the Maryland Act). *See, e.g., Southern Md. Hosp. Ctr.,* 48 Md.App. at 407–08, 427 A.2d 1051.[21] In explaining its holding that "manifest disregard" survives *Hall Street,* the Second Circuit said in *Stolt–Nielsen* that, where the arbitrator has " 'willfully flouted the governing law by refusing to apply it,' " the arbitrator has " 'failed to interpret the contract at all,' for *parties do not agree in advance to submit to arbitration that is carried out in manifest disregard of the law." Stolt–Nielsen,* 548 F.3d at 95 (emphasis added) (citations omitted). We find this reasoning instructive.

---

and perceived integrity of the judicial process.' " *Id.,* 416 Md. at 63, 5 A.3d 45 (citation omitted). The Court observed that *"stare decisis* is not completely unyielding, but allows for only a few exceptions," and identified "two circumstances when it is appropriate for this Court to overrule its own precedent": first, to "strike down a decision that is, 'clearly wrong and contrary to established principles' "; and second, "when there is a showing that the precedent has been superseded by significant changes in the law or facts." *Id.,* 416 Md. at 63–64, 5 A.3d 45 (citations omitted). Because the Court of Appeals has not repudiated the "manifest disregard" standard, there is no basis for our departure from *stare decisis.* Indeed, this Court has long recognized that we are "not free to ignore the rule of *stare decisis." Ramsey v. Prince George's County,* 18 Md.App. 385, 388, 308 A.2d 217 (1973). *Accord Malarkey v. State,* 188 Md.App. 126, 161–62, 981 A.2d 675 (2009).

21. Notably, the federal circuits that rejected "manifest disregard" after *Hall Street* had previously conceptualized the standard as a "judicially-created" ground for vacatur, rather than as a gloss on the statutory standards of review. *Frazier,* 604 F.3d at 1324; *accord Medicine Shoppe,* 614 F.3d at 489 (overruling earlier circuit authority that applied manifest disregard standard, stating: "Prior to *Hall Street,* a court could vacate arbitration awards on grounds other than those listed in the FAA."); *Citigroup Global Markets,* 562 F.3d at 353–54 ("[T]his circuit . . . came to recognize manifest disregard of the law as a nonstatutory basis for vacatur."). In contrast, our decisions have understood the "manifest disregard" standard as inherent in the statutory grounds of "undue means" and exceeding arbitral authority.

 The Act's grounds to vacate arbitral awards are all directed at preserving the integrity of the arbitration process. Arbitration is fundamentally a creature of contract, *Gold Coast Mall,* 298 Md. at 103, 468 A.2d 91, by which the parties relinquish their right to a judicial dispute resolution forum (containing a variety of procedural benefits, including comprehensive appellate review), in favor of "an expeditious and more affordable resolution of the controversy," including a choice of decision maker. *Schuele v. Case Handyman & Remodeling Servs., LLC,* 412 Md. 555, 575, 989 A.2d 210 (2010). However, while parties to arbitration agree to accept the arbitrator's interpretation of the law, *Soc'y of Am. Foresters, supra,* 114 Md.App. at 235–36, 689 A.2d 662, this does not mean that they agree to permit the arbitrator to fabricate the law from whole cloth. If agreeing to arbitrate meant relinquishing any expectation that the arbitrator will apply fundamental substantive legal principles, no rational party would ever agree to submit a dispute to arbitration. Thus, limited judicial review for manifest disregard of the law reinforces the process of arbitration by protecting the parties' *ex ante* expectation of an alternative but principled dispute resolution mechanism.

Finally, the parties have not asked us to reconsider the standard. To the contrary, they agree that an arbitrator's award may be vacated for manifest disregard of the law. Therefore, while recognizing that the statutory grounds are the sole grounds for vacatur of arbitral awards, we see no inconsistency in applying the "manifest disregard" standard.

Although the parties agree as to the standards of review that we have elucidated, they disagree as to the result we should reach in applying these standards. Because the parties' contentions implicate the law of easements, we pause to review applicable easement law.

 The basic legal principles governing easements are well established. " 'An easement is broadly defined as a nonpossessory interest in the real property of another....' " *Rogers v. P–M Hunter's Ridge, LLC,* 407 Md. 712, 729, 967 A.2d 807 (2009) (quoting *Boucher v. Boyer,* 301 Md. 679, 688,

484 A.2d 630 (1984)). An easement involves " 'the privilege of doing a certain class of act on, or to the detriment, of another's land, or a right against another that he refrain from doing a certain class of act on or in connection with his own land....' " *Rau v. Collins,* 167 Md.App. 176, 185, 891 A.2d 1175 (2006) (citation omitted). Generally, "the terms 'easement' and 'right-of-way' are regarded as synonymous." *Miller v. Kirkpatrick,* 377 Md. 335, 349, 833 A.2d 536 (2003).

As the Court of Appeals has explained, " '[i]n every instance of a private easement—that is, an easement not enjoyed by the public—there exists the characteristic feature of two distinct tenements—one dominant and the other servient.' " *Bd. of County Comm'rs of Garrett County v. Bell Atlantic–Md., Inc.,* 346 Md. 160, 175, 695 A.2d 171 (1997) (citation omitted). An easement can be described as a right of the owner of the dominant estate—often, a right of way—over the real property that comprises the servient estate. In other words: "A dominant tenant is the owner of '[a]n estate that benefits from an easement'; a servient tenant is the owner of '[a]n estate burdened by an easement.' " *Rogers,* 407 Md. at 715 n. 1, 967 A.2d 807 (quoting BLACKS LAW DICTIONARY 589 (8th ed.2004); alterations in *Rogers* ).

Of import here, there are several ways to create an easement. "An easement may be created by express grant, by reservation in a conveyance of land, or by implication." *Kobrine, L.L.C. v. Metzger,* 380 Md. 620, 635, 846 A.2d 403 (2004). An express easement, whether by grant or reservation, must be created by a written memorandum that satisfies the Statute of Frauds; and "a right[ ] of way created by deed" must satisfy " 'the mode and manner prescribed by the recording statutes.' " *Id.* at 636, 846 A.2d 403 (citations omitted). In *Rogers,* 407 Md. at 729–30, 967 A.2d 807, the Court explained: "An express easement by reservation often arises when a property owner conveys a portion of his property to another, which would otherwise render the retained part inaccessible, so the reservation permits a right-of-way." In contrast, an easement by implication " 'may be created in a

variety of ways, such as by prescription, necessity, the filing of plats, estoppel and implied grant or reservation where a quasi-easement has existed while the two tracts are one.'" *Id.* at 730, 967 A.2d 807 (quoting *Boucher,* 301 Md. at 688, 484 A.2d 630).

This case involves principles regarding both express easements and a particular category of implied easement: an implied easement by necessity. As we have seen, Ryan and Jekel executed two documents—the Original and the Second Jeep Trail Agreement—which purportedly burdened Lot 1 (the servient estate, then owned by Jekel) with an express easement benefitting Lot 2 (the dominant estate, then owned by Ryan). However, in the absence of an express easement, which is what the arbitrator found (*i.e.,* that the express easement did not exist, or was not so extensive as to give Lot 2 access to Morgan Station Road), Sharp argues that he is entitled to an implied easement by necessity, discussed *infra.*

Appellant alleges four errors in the decision of the arbitrator, which he contends amount to a decision "in manifest disregard of the law." As we shall explain, appellant's first three arguments, which challenge the arbitrator's decision making regarding the alleged express easement, cannot overcome the deferential standard of our review. But, we find merit in appellant's final argument, that the arbitrator manifestly disregarded the law when he ruled that appellant was not entitled to an implied easement by necessity.

First, appellant contends: "It is clear from the language of the [Second Jeep Trail Agreement] that there are two documents referred to that locate the easement: (1) a 'jeep trail' shown on the [Health Department Plan]; and, (2) the 'new road' constructed" under the MDE Permit. According to appellant, "the arbitrator exceeded his power when he failed to locate and determine the 'New Road' referred to in the [Second Jeep Trail Agreement] when the location was actually shown on the exhibits referred to and relied on by the arbitrator in reaching his decision." Instead, appellant con-

tends that the arbitrator "ignored the plat" showing the "new road" approved by the MDE Permit.

Second, appellant argues: "The uncontradicted evidence was that there was an existing paved driveway which still remains on Lot 1 and Lot 2. . . . [I]f the easement cannot be located by the [Second Jeep Trail Agreement], it must be presumed to be in the location the parties constructed their driveway." He relies on *Sibbel v. Fitch*, 182 Md. 323, 34 A.2d 773 (1943), and *Michael v. Needham*, 39 Md.App. 271, 384 A.2d 473, *cert. denied*, 283 Md. 736 (1978), which he describes as standing for the proposition that,

> when there is a right of way expressly granted, but not by specific description, but there is a right of way located at the time of the grant and used for a long period of time, such right of way will be held to be the location of the way granted as if located by metes and bounds in the same location, unless a contrary intention appears.

Third, appellant posits that, "if the circumstances show that a purchaser had notice of prior equities or unrecorded easements which ought to have put a person of ordinary prudence on inquiry," Maryland law is "well established" that "the purchaser . . . takes his title subject to all equities of which he had knowledge and which an investigation would disclose." "Furthermore," he argues, "a purchaser of property cannot fail to investigate matters plain and open to him when purchasing property." In Sharp's view, because the existing driveway over Lot 1 was readily apparent when the Downeys purchased the lot, "[i]t was irrational and a manifest disregard of the law for the Award to ignore the existing driveway as an open and apparent encumbrance on the Downey's [sic] property."

We need not iterate more extensively appellant's first three claims, nor appellees' responses to them, because the claims simply cannot surmount the applicable standard of review.[22] The arbitrator's conclusion that the express ease-

---

22. As noted, the arbitration proceedings were not transcribed, nor does the record contain all of the documentary exhibits submitted to the

ment delineated in the Second Jeep Trail Agreement did not reach Lot 2, and did not reach Morgan Station Road, was based on the arbitrator's review of the evidence, including a "close examination of the Health Department Plan," and his construction of the Second Jeep Trail Agreement.

The arbitrator gave particular weight to the lines depicting the jeep trail on the Health Department Plan. He concluded that the easement described in the Second Jeep Trail Agreement, as delineated by the Health Department Plan, stopped short of Lot 2, and did "not extend to Morgan Station Road but connected to the Verba O. Day right of way to access Morgan Station Road." The Award fully and rationally explained this decision. Although another tribunal might have taken a different view of the evidence, or might have interpreted the Second Jeep Trail Agreement differently, the conclusions are founded upon the evidence and are certainly not "completely irrational." *Kroll, supra,* 29 Md.App. at 409, 348 A.2d 870.

In particular, we reject appellant's first claim, that the arbitrator manifestly disregarded the law by failing to specifically locate the "new road" approved by the MDE Permit. We agree with the circuit court that the arbitrator "was not obligated to issue a decision as to each proffered statement of fact" at issue. The arbitrator considered the evidence submitted regarding the MDE Permit, but did not find that the MDE Permit extended the "easement created by the [Second Jeep Trail Agreement] . . . to Morgan Stat[ion] Road," in part because the driveway that Ryan constructed was not actually built at the location shown on Ryan's Joint Permit Application for the MDE Permit.

---

arbitrator. We emphasize that the arbitrator's factual findings are beyond review. *See Wicomico County Educ. Ass'n v. Bd. of Educ. of Wicomico County,* 59 Md.App. 564, 567–69, 477 A.2d 279 (1984) (explaining that parties to arbitration cannot bootstrap their "failure to order the transcript" of an arbitration proceeding into a *"de novo* hearing where the judge hears anew the testimony and assesses his evaluation of the witnesses rather than relying upon that of the arbitrator").

Likewise, we discern no merit in appellant's second argument. *Sibbel* involved a deed to a parcel that expressly "'reserv[ed] ... a right of way to and from'" an adjacent landlocked tract, but did not define the location of the way. *Sibbel,* 182 Md. at 325, 34 A.2d 773 (quoting deed). Although the right of way was not expressly defined in the deed, there was an "old road," in use for "more than half a century," that ran across the deeded parcel to the landlocked tract. *Id.* at 326, 34 A.2d 773. In that context, the Court quoted favorably the discussion of easements in *Corpus Juris Secundum* ("CJS"): "'Where a way is granted without fixing its location, but there is a way already located at the time of the grant, such way will be held to be the location of the way granted unless a contrary intention appears.'" *Id.* at 326–27, 34 A.2d 773; *see also Michael,* 39 Md.App. at 280, 384 A.2d 473 (quoting the same passage from CJS, in a case where there was a right of way in long use, despite no express easement). However, the rule of law quoted in *Sibbel* and *Michael* is not apposite to the location of the express easement allegedly established by the Second Jeep Trail Agreement. The Second Jeep Trail Agreement, by incorporation of the Health Department Plan, specifically defined the location of a right of way, but the arbitrator found that the easement, as located, simply did not provide access to Lot 2 and Morgan Station Road. In other words, the Second Jeep Trail Agreement did not grant a way "'without fixing its location.'" *Sibbel,* 182 Md. at 326–27, 34 A.2d 773 (quoting CJS).

Appellant's third argument, which relies on *Kimm v. Andrews,* 270 Md. 601, 313 A.2d 466 (1974), *Fertitta v. Bay Shore Development Corp.,* 266 Md. 59, 291 A.2d 662 (1972), and *Kramer v. Emche,* 64 Md.App. 27, 494 A.2d 225, *cert. denied,* 304 Md. 297, 498 A.2d 1184 (1985), is similarly misplaced. These three cases stand for the proposition that if a purchaser has actual knowledge of "prior equities or unrecorded interests" on a property, or has "knowledge of circumstances which ought to have put a person of ordinary prudence on inquiry," the purchaser is not entitled to *bona fide* purchaser status, and takes the property subject to the unrecorded

prior equities "which such an investigation would in all probability have disclosed if it had been properly pursued." *Fertitta*, 266 Md. at 72–73, 291 A.2d 662; *accord Kimm*, 270 Md. at 621, 313 A.2d 466 (quoting *Fertitta* ); *Kramer*, 64 Md.App. at 43–44, 494 A.2d 225 (same).[23] In this case, the Second Jeep Trail Agreement was recorded in the Land Records of Howard County, and there is no dispute that the parties purchased their respective parcels subject to that document. As we have said, the arbitrator determined that, by its terms, the Second Jeep Trail Agreement did not provide Lot 2 with access to Morgan Station Road. Therefore, the principles expressed in *Fertitta, Kimm,* and *Kramer* with respect to actual and constructive notice of unrecorded encumbrances are not relevant here.

■ In appellant's fourth and final argument, Sharp contests the arbitrator's determination that he did not have an implied easement by necessity.

Sharp contends that there "was no factual dispute" that "there is no practical access from Lot 2 to Morgan Station Road over the entirety of Lot 2, and the only practical access is over Lot 1." He continues: "There was also no dispute that the necessity for an easement for the Driveway existed both at the time Lot 1 and Lot 2 were severed by Ryan, and has continued since." Further, appellant maintains that "[t]he intent of Jekel and Ryan to create an easement over Lot 1 is clearly shown" by the Original and the Second Jeep Trail Agreement, and that "[i]t was not the intention of Jekel and Ryan when they expressly created the two easement documents for ingress and egress to landlock Lot 1."

According to Sharp, "[i]f there is no express easement . . . there nonetheless must be an implied easement under the facts and the law," and the "undisputed facts satisfy all the

---

**23.** In contrast, a *bona fide* purchaser for value ordinarily takes property subject only to prior encumbrances of which the purchaser has actual knowledge or which have been properly recorded and indexed in the land records. *See, e.g., Waicker v. Banegura,* 357 Md. 450, 463–65, 745 A.2d 419 (2000); *Grayson v. Buffington,* 233 Md. 340, 343, 196 A.2d 893 (1964).

conditions necessary under Maryland law to create an easement by necessity." Therefore, he insists that the arbitrator's finding of no implied easement by necessity, which "leaves Lot 2 landlocked," was "clearly an arbitrary, irrational decision in manifest disregard of the law."

In response, appellees observe that a critical element of an implied easement by necessity is that the necessity for the easement must exist "both at the time of the severance of title and the time of the exercise of the easement." They contend that "any claim that Sharp is entitled to an easement by necessity must be rejected because the *express* easement which defined the 'Jeep Trails' . . . was drafted by Ryan . . . and *post dates* the division of the single parcel into two separate parcels." In their view, this compels the conclusion that "the necessity did not exist at the time of severance of title, preventing a finding of an implied easement by necessity."

Moreover, appellees maintain that Maryland law permits a landowner "to land lock a parcel." Therefore, they argue that "the only permissible conclusion is that the [Second] Jeep Trail[ ] Agreement means precisely what it says"—which, as the arbitrator found, was that there was no easement connecting Lot 2 to Morgan Station Road.

We conclude that the arbitrator erred in rejecting an easement by necessity, and that his error rises to the level of manifest disregard of the law. We elaborate.

■ Implied easements by necessity "arise from a presumption that the parties intended that the party needing the easement should have access over the land." *Calvert Joint Venture # 140 v. Snider,* 373 Md. 18, 40, 816 A.2d 854 (2003). For example: "Where a man owns two closes, A and B, with a road from A over B, to the highway, and sells close B, without reserving, in the deed, any right of way, if he has no other road, he may use the one over B as a way of necessity." *McTavish v. Carroll,* 7 Md. 352, 359 (1855).[24]

---

24. The example given by the *McTavish* Court would be an implied *reservation.* Another 19th-century case, *Oliver v. Hook,* 47 Md. 301, 309

 The doctrine of easement by necessity " 'is based upon public policy, which is favorable to full utilization of land and the presumption that parties do not intend to render land unfit for occupancy.' " *Stansbury v. MDR Dev., L.L.C.,* 390 Md. 476, 488, 889 A.2d 403 (2006) (quoting *Condry v. Laurie,* 184 Md. 317, 321, 41 A.2d 66 (1945)); *see also Hancock v. Henderson,* 236 Md. 98, 104, 202 A.2d 599 (1964). The public policy exists in recognition that to allow a landlocked parcel inadvertently to be created affects not only the initial owner of that parcel, but every subsequent owner as well. By cutting off the land from all access to public ways, landlocking a parcel renders the land unuseable for virtually any future purpose.[25]

---

(1877), describes an implied *grant:* "[W]here one party deeds to another a parcel of land surrounded by other lands, and there is no access to the land thus conveyed, except over the lands of the grantor, the latter gives the grantee a right of way by implication, over his own land to that conveyed by him." In this case, the alleged easement is akin to the situation described in *McTavish;* it is a reservation by Ryan of a right-of-way over land (the Downey Lot) that he conveyed to Jekel.

**25.** Maryland is joined by many of our sister states in recognizing strong public policy grounds underpinning the doctrine of implied easements by necessity. *See, e.g., Kelly v. Panther Creek Plantation, LLC,* 934 So.2d 1049, 1055 (Ala.2006) (" 'The rationale for allowing an easement by necessity is that public policy demands that land not be rendered unusable.' ") (citation omitted); *Murphy v. Burch,* 46 Cal.4th 157, 92 Cal.Rptr.3d 381, 205 P.3d 289, 293 (2009) (" '[T]he demands of our society prevent any man-made efforts to hold land in perpetual idleness as would result if it were cut off from all access by being completely surrounded by lands privately owned.' Hence, easements by necessity are grounded in the public policy that property should not be rendered unfit for occupancy or successful cultivation because access to the property is lacking."); *Hollywyle Ass'n v. Hollister,* 164 Conn. 389, 324 A.2d 247, 253 (1973) ("The presumption as to the intent of the parties is a fiction of law" in the doctrine of easement by necessity, "and merely disguises the public policy that no land should be left inaccessible or incapable of being put to profitable use."); *Backman v. Lawrence,* 147 Idaho 390, 210 P.3d 75, 79–80 (2009) ("Idaho public policy favors the full use of lands, and this is one of the driving forces behind easements by necessity[.]"); *Smith v. Heissinger,* 319 Ill.App.3d 150, 253 Ill.Dec. 543, 745 N.E.2d 666, 672 (2001) (doctrine "of implied easements … furthers the public policy favoring full utilization of land"); *Jones v. Sparks,* 297 S.W.3d 73, 78 (Ky.Ct.App.2009) ("An easement by necessity is based on public policy and an implied intent of the parties favoring

In *Stansbury,* the Court of Appeals "summed up" the "prerequisites to the creation of an easement by necessity," 390 Md. at 489, 889 A.2d 403:

(1) initial unity of title of the parcels of real property in question; (2) severance of the unity of title by conveyance of one of the parcels; and (3) the easement must be necessary in order for the grantor or grantee of the property in question to be able to access his or her land, with the necessity existing both at the time of the severance of title and at the time of the exercise of the easement.

Here, there is no controversy as to the first two elements; it is undisputed that Ryan initially owned both Lot 1 and Lot 2 as a single, undivided parcel, and then severed his unity of title by partitioning the lots and conveying Lot 1 to Jekel.

---

the use and development of land as opposed to rendering it useless."); *Northland Realty, LLC v. Crawford,* 953 A.2d 359, 363 (Me.2008) ("We recognize easements by necessity in light of the public policy that land should not be rendered unfit for use."); *Schumacher v. Dept. of Nat. Res.,* 275 Mich.App. 121, 737 N.W.2d 782, 789 (2007) ("An easement by necessity is based on 'the presumed intent of the parties,' as well as public policy that 'favors the productive and beneficial use of property.' " (Citation omitted.)); *Frame v. Huber,* 355 Mont. 515, 231 P.3d 589, 591 (2010) ("Easements by necessity arose from a public policy against isolating tracts of land and thereby minimizing their utility...."); *Mandia v. Applegate,* 310 N.J.Super. 435, 708 A.2d 1211, 1215 (App.Div.1998) (doctrine of easement by necessity " 'is predicated upon the strong public policy that no land may be made inaccessible and useless' " (citation omitted)); *City of Bismarck v. Casey,* 77 N.D. 295, 43 N.W.2d 372, 378 (1950) (" 'A rule of sound public policy—namely, that lands should not be rendered unfit for occupancy or successful cultivation—supports the implied grant or reservation of ways of necessity.' " (Citation omitted.)); *Myers v. LaCasse,* 176 Vt. 29, 838 A.2d 50, 56 (2003) (doctrine of easement by necessity is based on "public policy rationale that 'no land be left inaccessible for the purposes of cultivation' " (citation omitted)); *Hellberg v. Coffin Sheep Co.,* 66 Wash.2d 664, 404 P.2d 770, 773 (1965) ("An easement of necessity is an expression of a public policy that will not permit property to be landlocked and rendered useless."); *McCormick v. Schubring,* 267 Wis.2d 141, 672 N.W.2d 63, 69 n. 3 (2003) ("Easements of necessity are 'supported by a public policy favoring the full and productive utilization of land.' " (Citation omitted.)). *But see Hurlocker v. Medina,* 118 N.M. 30, 878 P.2d 348, 352 (App.1994) ("[T]he implied intention of the parties is a more reliable foundation than public policy upon which to build the analytical framework necessary to sustain easements by necessity[.]").

Rather, the parties' dispute centers around the element of necessity.

 As the nomenclature suggests, necessity is a critical component of the doctrine. An easement by necessity will only arise where "the easement is reasonably necessary for the fair enjoyment of the property." *Greenwalt v. McCardell*, 178 Md. 132, 138, 12 A.2d 522 (1940). Indeed, " '[m]ere inconvenience will not be sufficient to justify the finding of a way of necessity. It is only in [the] case of strictest necessity, where it would not be reasonable to suppose that the parties intended the contrary, that the principle of implied easement can be invoked.' " *Stansbury*, 390 Md. at 488, 889 A.2d 403 (citation omitted; alteration in *Stansbury* ). The necessity required has also been described as " 'imperative and absolute.' " *Shpak v. Oletsky*, 280 Md. 355, 361, 373 A.2d 1234 (1977) (citations omitted).

 To be sure, " '[g]rants of easements by implication are looked upon with jealousy and are construed with strictness by the courts.' " *Id.* (quoting *Condry*, 184 Md. at 321, 41 A.2d 66). And, " '[t]he rule with respect to implied reservations is much more strict than that with respect to implied grants.' " *Shpak*, 280 Md. at 361, 373 A.2d 1234 (quoting *Slear v. Jankiewicz*, 189 Md. 18, 22, 54 A.2d 137 (1947), *cert. denied*, 333 U.S. 827, 68 S.Ct. 453, 92 L.Ed. 1112 (1948)).

 " '[A] right of way of necessity can only be raised out of the land granted or reserved by the grantor, and never out of the land of a stranger.' " *Shpak*, 280 Md. at 361, 373 A.2d 1234 (citation omitted; alteration in *Shpak* ). In other words, "[t]he dominant and servient estates must at some point have belonged to the same person." *Rau*, 167 Md.App. at 186, 891 A.2d 1175. Moreover, the "necessity" must arise "at the time of the initial grant of the property," and " 'cannot be established by a subsequent necessity.' " *Stansbury*, 390 Md. at 488, 889 A.2d 403 (citation omitted). And, "a way of necessity exists only so long as the necessity itself remains." *Shpak*, 280 Md. at 363, 373 A.2d 1234. Therefore, the necessi-

ty must be continuous, beginning at the time that the dominant and servient properties are subdivided.

On occasion, the Court has stated that "[n]ecessity of itself does not create a right of way; it is merely a fact offered in evidence to show an intention to establish a right of way by raising the presumption of a grant." *Greenwalt,* 178 Md. at 139, 12 A.2d 522. *See also Shpak,* 280 Md. at 361, 373 A.2d 1234 (quoting L. Jones, *Easements* § 304 (1898)) (" 'It is not the necessity which creates the right of way, but the fair construction of the acts of the parties. The necessity merely furnishes evidence as to the real intention of the parties.' "). However, in *Hancock v. Henderson, supra,* 236 Md. at 104 n. 2, 202 A.2d 599, the Court observed that "[t]he concept that a way of necessity arises from the presumed intention of the parties has been criticized," and characterized the majority in *Condry, supra,* 184 Md. 317, 41 A.2d 66, as adopting the proposition that "the basis for implying the grant was the necessity of ingress and egress over the grantor's land, imposed by law regardless of a contrary expression of intent by the parties." *Hancock,* 236 Md. at 104 n. 2, 202 A.2d 599.

Nevertheless, the *Hancock* Court recognized that "[t]he cases seem to be searching for the intent of the parties. . . ." *Id.* at 104, 202 A.2d 599. This is because "the basis of an implied easement is the implied intention of the parties that an easement be created[.]" *Mitchell v. Houstle,* 217 Md. 259, 265, 142 A.2d 556 (1958). But, as the Court explained in *Stansbury,* in the case of an implied easement by necessity, " '[t]he intent to create the easement is ... deemed to be shown by the type of transaction involved and no other evidence is necessary to establish the intent of the parties to create a way of necessity.' " *Stansbury,* 390 Md. at 489, 889 A.2d 403 (quoting 3 HERBERT T. TIFFANY, THE LAW OF REAL PROPERTY, § 793 (3d ed.1939, 2004 Supp.)).

The *Stansbury* Court made another important observation, *id.* at 485 n. 5, 889 A.2d 403:

Technically an easement by necessity exists by reason of the facts and circumstances present in a situation. It exists

without a court order. It exists by operation of law. When disputes arise as to its existence, however, a court action is the proper way to resolve the disputes. What a court does is to affirm (or not) that an easement by necessity already exists. The court does not "create" or "establish" such an easement. In some circumstances—if an easement by necessity is determined to be in existence—a court may "locate" that pre-existing easement at a particular location. But courts generally do not "create" or "establish" easements; they recognize or affirm (or not) easements.

As we have seen, the doctrine of implied easement by necessity is founded in a strong public policy that favors "full utilization of land and the presumption that parties do not intend to render land unfit for occupancy." *Condry v. Laurie, supra,* 184 Md. at 321, 41 A.2d 66. Moreover, as indicated, the elements of implied easement by necessity are well established.

██ Here, it was plain that Lot 1 and Lot 2 satisfied the first two elements to show an implied easement by necessity: "(1) initial unity of title of the parcels of real property in question; [and] (2) severance of the unity of title by conveyance of one of the parcels." *Stansbury, supra,* 390 Md. at 489, 889 A.2d 403. In that context, the arbitrator's statements that "Sharp has no access to Morgan Station Road" and that "Lot 2 is landlocked" are fundamentally irreconcilable with his statement that "Ryan, now Sharp, does not have an implied easement by necessity, he does not need one." As the Court in *Stansbury* explained, "an easement by necessity exists by reason of the facts and circumstances present in a situation." 390 Md. at 485 n. 5, 889 A.2d 403. Given the arbitrator's finding that Lot 2 was landlocked, the necessity required to show an implied easement by necessity was present, and it was "completely irrational," *Kroll,* 29 Md.App. at 409, 348 A.2d 870, for the arbitrator conclude that appellant "does not need" an easement.

As noted, appellees argue that, at the time the Sharp Lot was created, no necessity existed. To be sure, the arbitrator's

decision was ultimately based on interpretation of the Second Jeep Trail Agreement, which Sharp and Jekel executed a year after the subdivision of Lots 1 and 2 and the conveyance of Lot 1 to Jekel. The arbitrator recognized explicitly that the Second Jeep Trail Agreement was the "sole controlling extant easement" and "entirely replaced" the Original Jeep Trail Agreement. But, in reaching his decision regarding the scope of the Second Jeep Trail Agreement, the arbitrator first construed the Original Jeep Trail Agreement. Explaining his decision, the arbitrator observed that the "first recorded evidence of the Jeep Trail easement occurred on February 20, 1996 when Ryan created Lot 1 and Lot 2, conveyed Lot 1 to Jeckel [sic], created with Jeckel [sic] the Riverfront Easement ... and created with Jekel 'the existing Jeep Trail' Easement." (Citations omitted.) In the Award, the arbitrator continued to refer to the Original Jeep Trail Agreement with the phrase " 'existing Jeep Trail' Easement," and by reference to its exhibit number in the arbitration proceeding, which was Claimant's Exhibit 6.[26] After quoting the Original Jeep Trail Agreement at length, the arbitrator concluded that "[t]he existing Jeep Trail Easement (Cl., Ex. 6) [*i.e.*, the Original Jeep Trail Agreement] gave an easement through Lot 1 to Ryan, but it did not extend into Lot 2, the Riverfront Easement, or Morgan Station Road."

Moreover, even if the arbitrator had not explicitly construed the scope of the Original Jeep Trail Agreement, his construction of the Second Jeep Trail Agreement relied on his interpretation of the Health Department Plan, which defined the location of the right of way in both the Original and the Second Jeep Trail Agreement. Indeed, in the Original Jeep Trail Agreement, the Health Department Plan was the only document incorporated to locate the easement. If the Health Department Plan does not describe a right of way that connected the Sharp Lot to Morgan Station Road when incorpo-

---

26. In contrast, the arbitrator referred to the Second Jeep Trail Agreement with the phrase " 'Jeep Trails' Easement," and by reference to Claimant's Exhibit 7.

rated in the Second Jeep Trail Agreement, it follows logically that the same document cannot describe a right of way connecting the lot to the road when incorporated into the Original Jeep Trail Agreement.

The inescapable conclusion is that the arbitrator determined that there was never an express easement over Lot 1 that provided Lot 2 with access to Morgan Station Road. Therefore, under the arbitrator's construction of the easement instruments (which was neither illogical nor manifestly in disregard of the law), Lot 2 was landlocked from its inception. Thus, contrary to appellees' contention, the necessity required for an implied easement by necessity existed from the time that unity of title was severed until the present.

In support of their second argument, *i.e.*, that a landowner can landlock himself, appellees rely upon *Shpak v. Oletsky, supra,* 280 Md. 355, 373 A.2d 1234. There, the Court said that Maryland law "does not prohibit one from cutting himself off from all access to his land." *Id.* at 364–65, 373 A.2d 1234 (citation omitted). But, appellees' reading of *Shpak* is selective.

For the proposition that the law permits a landowner to landlock himself, the *Shpak* Court relied on a law review article by Professor J. Simonton, *Ways by Necessity,* 33 W. VA. L.Q. 64, 78–79 (1923), from which the Court quoted at length, 280 Md. at 365, 373 A.2d 1234 (italics in *Shpak;* boldface added):

"Is the so-called presumption of intent conclusive, or may it be overcome by showing **the real intent of the parties?** To put it in terms of public policy, are the interests in favor of allowing the easement strong enough to overcome the contrary expressed intent of the parties? ... [*I*]*t seems the presumption as to an easement by necessity may be overcome by showing the **actual contrary intent of the parties.** Seemingly the law allows a landowner to cut off all his rights of access to his land, **if he so desires.**"

The passage quoted in *Shpak* is in accord with the authorities we have cited, recognizing that "the basis of an implied

easement [by necessity] is the implied intent of the parties that an easement be created," as demonstrated by the necessity for a right of way to reach a public road. *Mitchell, supra,* 217 Md. at 265, 142 A.2d 556. Thus, *Shpak* supports the proposition that, when the parties' actual intent is clear, there is no basis to infer a contrary intent.

In this case, it is quite clear that Ryan never intended to landlock Lot 2. To the contrary, both Ryan and Jekel unequivocally intended to create an easement for the express purpose of ingress and egress to Lot 2. Indeed, both the Original and the Second Jeep Trail Agreement used the phrase "ingress and egress" in their titles, and explicitly stated that the purpose of each agreement was to provide for ingress and egress. In a decision that we have found was not "completely irrational," the arbitrator determined that the easement over the "jeep trails" described in those agreements was, in the words of appellees' counsel at oral argument, "defective," because the Health Department Plan on which the easement was based did not show the trails extending to Morgan Station Road or to Lot 2. But, this does not negate Ryan and Jekel's clearly-expressed intent to create an easement over Lot 1 for ingress and egress to Lot 2. Nor, critically, does it negate the *necessity* for such an easement; without the easement, Lot 2 is rendered inaccessible.[27]

---

27. The arbitrator evidently concluded that the clear and unambiguous import of the Health Department Plan was that the jeep trails did not reach Morgan Station Road. Although we must defer to the arbitrator's construction of the Second Jeep Trail Agreement, we note that it is in some tension with the "cardinal rule of contract interpretation," which "is to give effect to the parties' intentions." *Tomran, Inc. v. Passano,* 391 Md. 1, 14, 891 A.2d 336 (2006). *See also Md. Agric. Land Pres. Found. v. Claggett,* 412 Md. 45, 62, 985 A.2d 565 (2009) (" 'The primary rule for the construction of contracts generally—and the rule is applicable to the construction of a grant of an easement—is that a court should ascertain and give effect to the intention of the parties at the time the contract was made, if that be possible.' ") (citation omitted). Nevertheless, "under the objective theory [of contract interpretation] 'the clear and unambiguous language of an agreement will not give away [sic] to what the parties thought that the agreement meant or intended it to mean.' " *Dennis v. Fire & Police Employees' Ret. Sys.,* 390 Md. 639, 658, 890 A.2d 737 (2006) (citation omitted).

The situation is akin to *Condry v. Laurie, supra,* 184 Md. 317, 41 A.2d 66. In that case, Condry's predecessor in title, Rephorn, conveyed a portion of his property to the Hittles, who were predecessors in title of Laurie. *Id.* at 319, 41 A.2d 66. Rephorn retained a tract that separated the Hittles' property from the county road. *Id.* The Hittles' deed to their property granted them "a 'license to use the private road from the County Road to and from the property now conveyed . . . while they shall remain owners of the property.' " *Id.* (quoting deed). After Condry and Laurie acquired their respective titles to the adjoining properties (after a lengthy chain of title in each case), Condry barricaded the private road across his property, allegedly preventing Laurie from accessing his own parcel. *Id.*

The Court rejected Condry's argument that, by granting an explicit license to the Hittles, Rephorn had negated an implied easement by necessity. The *Condry* Court explained that a critical difference between a license and an easement is that a license " 'ceases with the death of either party, and cannot be transferred or alienated by the licensee, because it is a personal matter,' " *id.* at 320, 41 A.2d 66 (citation omitted), while an easement runs with the land and is binding on successors in title. The Court said, *id.* at 323, 41 A.2d 66:

> While the Hittles were given a license to use the designated road only as long as they remained owners of the parcel conveyed, the license did not imply that future owners might be barred from access to the county road. When the licensees were no longer owners of the property, succeeding owners were still entitled to a way of necessity, although the way might not necessarily be the same as that used by the licensees.

*Millson v. Laughlin, supra,* 217 Md. 576, 142 A.2d 810, is also instructive. There, the predecessors in title of adjoining landowners had executed an express easement for the dominant owner to travel across the servient owner's land. *Id.* at 580–82, 142 A.2d 810. The question before the Court was whether the existence of the express easement for ingress and egress compelled the conclusion that the dominant owner was

not entitled to an implied easement by necessity for an electric pole and wires that ran across the servient property to provide electrical service to her house. *Id.* at 580, 142 A.2d 810. Relying on *Condry,* the Court determined that the servient owner was entitled to the implied easement. *Id.* at 584, 142 A.2d 810. It explained, *id.* at 583–84, 142 A.2d 810:

> [T]he express easement of travel should not be held as establishing an intention on the part of the parties not to grant an easement which was clearly necessary and perfectly obvious.... It was contended [in *Condry* ] that the express grant [of a license] for a limited time negated an implied grant of a way of necessity.... [B]ut the [*Condry* Court] held that the succeeding owners were entitled to a way of necessity which had been granted by way of implication.... The court concludes that the appellant has an easement to maintain the electric line across the property of the appellee....

▆ Similarly, in this case, the parties' execution of an express easement for ingress and egress that later turned out to be "defective," so as not to actually provide ingress and egress, cannot supply a supposed intent of the parties to landlock Lot 2, so as to defeat the presumption of an easement. Although it was defective for its intended purpose, the express easement demonstrated the clear intent of the parties' predecessors not to landlock Lot 2.

▆ In sum, here the arbitrator ruled that there was no implied easement by necessity because it was "not needed," although the Award, on its face, found the existence of all of the predicates of an implied easement by necessity. This error is central to the dispute at hand. It works a " 'manifest injustice' " to appellant and any successor to his title, *Baltimore Teachers Union, supra,* 108 Md.App. at 181, 671 A.2d 80 (citation omitted), and produced an Award that violated clear public policy that disfavors rendering land inaccessible.[28]

---

28. It is also plain from the record that the arbitrator was made aware of the law regarding implied easements by necessity when appellant

Therefore, we conclude that the error goes beyond mere legal error and constitutes manifest disregard of the law. It follows that the circuit court erred in granting appellees' motion to confirm the Award and in denying appellant's motion to vacate it.[29] Accordingly, we shall reverse and remand to the circuit court for entry of an order vacating Findings 5, 6, and 7 of the Award.[30]

■ As we have seen, the arbitrator's conclusion that there is no express easement providing Lot 2 with access to Morgan Station Road cannot be disturbed, while the conclusion that appellant is entitled to an implied easement by necessity over Lot 1 to travel between Lot 2 and Morgan Station Road is compelled as a matter of law. On remand, there must be a determination (whether by the court or an arbitrator) [31] of the precise location of the implied easement by

---

filed his Motion to Reconsider (if not earlier in the arbitration proceeding), but "proceeded to disregard" the applicable law. *MCR, supra,* 148 Md.App. at 120, 811 A.2d 331.

**29.** We underscore that it is only in the extraordinarily rare circumstance that a court may vacate the decision of an arbitrator on its merits, and the basis must be " 'apparent upon the face of the award.' " *Baltimore Teachers Union, supra,* 108 Md.App. at 181, 671 A.2d 80 (citation omitted). This is consistent with the deference accorded to the parties' contractual choice of decision maker, dating to some of the earliest decisions of the Court of Appeals. *See, e.g., Goldsmith's Adm'r v. Tilly,* 1 H. & J. 361, 364 (Md.1802) ("The court will not enter at all into the merits of the matter referred to arbitrators; but only consider such legal objections as appear on the *face of the award,* and such as go to the *misbehaviour* of arbitrators.") (emphasis in original).

**30.** Appellant's motion only asked the court to vacate Findings 5, 6, and 7 of the Award, and therefore the balance of the Award (*i.e.,* Findings 1, 2, 3, 4, and 8) must be confirmed.

**31.** We express no view as to whether the issue of the location of the implied easement is within the scope of the parties' arbitration agreement. *See NRT Mid-Atlantic, Inc. v. Innovative Props., Inc.,* 144 Md. App. 263, 280, 797 A.2d 824 (2002) ("When the language of an arbitration clause is plain and the issue in dispute clearly falls within its scope, the court must compel arbitration. Conversely, if there is an arbitration agreement but the issue in dispute plainly falls outside its scope, the court must deny a motion to compel arbitration. When the parties have agreed to arbitrate, but the scope of the arbitration clause

necessity.[32] We explain.

The *Stansbury* Court instructed that "[i]n some circumstances—if an easement by necessity is determined to be in existence—a court may 'locate' that pre-existing easement at a particular location." *Stansbury*, 390 Md. at 485 n. 5, 889 A.2d 403. Similarly, in *Millson*, 217 Md. at 584, 142 A.2d 810, although the Court found that the dominant tenant was entitled to an implied easement by necessity for an electrical line to her house, the Court said, "this does not necessarily mean that she had a right to insist that the line and all its appurtenances, including the pole in question, remain in the exact location previously established." In *Michael v. Needham*, 39 Md.App. at 281, 384 A.2d 473, we remanded for location of the easement at issue in that case, stating:

> We would anticipate that the parties with the assistance of the chancellor should be able to agree on the location of a right of way which would be least onerous to the appellee and passable with reasonable convenience by the appellant. In the absence of such an agreement, it will be the responsibility of the chancellor to take such testimony as might be required and to locate the right of way after due consideration of the equities of the matter.

*See also Stair v. Miller*, 52 Md.App. 108, 111, 447 A.2d 109 (1982) ("It is well established that a way of necessity should be located so as to be the least onerous to the owner of the

---

is ambiguous, so it is not evident whether their dispute is subject to arbitration, the arbitrator, not the court, must resolve the ambiguity[.]") (citations omitted). *See also Rourke v. Amchem Prods., Inc.*, 384 Md. 329, 354 n. 12, 863 A.2d 926 (2004); *Gold Coast Mall, Inc.*, 298 Md. at 107, 468 A.2d 91; *Nowak v. NAHB Research Ctr., Inc.*, 157 Md.App. 24, 34–36, 848 A.2d 705 (2004). If the court determines that the issue is arbitrable, it will have discretion whether to order that the issue be heard by the original arbitrator or a new arbitrator. *See* C.J. § 3-225(a)–(b).

32. The only restrictions we foresee are that, (1) pursuant to the uncontested findings of the Award, the right of way cannot enter the Riverfront Easement, *see* note 11, *supra;* and (2) the right of way must comply with the MDE Permit, or a further permit from the regulatory authorities likely will have to be obtained.

servient estate while, at the same time, being of reasonable convenience to the owner of the dominant estate."); *Johnson v. Robinson,* 26 Md.App. 568, 582, 338 A.2d 88 ("Upon remand, the chancellor is directed to decree a way of necessity, the reasonable location of which he shall establish as to inconvenience appellee only so much as is necessary to provide appellant ingress and egress to her land."), *cert. denied,* 276 Md. 748 (1975).

**JUDGMENT REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR HOWARD COUNTY WITH INSTRUCTIONS TO VACATE FINDINGS 5, 6, AND 7 OF THE ARBITRATION AWARD AND CONDUCT FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. APPELLEES TO PAY THE COSTS.**